# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued December 12, 2016       Decided April 11, 2017

No. 09-1017

WATERKEEPER ALLIANCE, ET AL.,
PETITIONERS

v.

ENVIRONMENTAL PROTECTION AGENCY,
RESPONDENT

U.S. POULTRY AND EGG ASSOCIATION, ET AL.,
INTERVENORS

---

Consolidated with 09-1104

---

On Petitions for Review of Final Regulation
Issued by the U.S. Environmental Protection Agency

---

*Jonathan J. Smith* argued the cause for petitioners Waterkeeper Alliance, et al. With him on the briefs was *Eve C. Gartner*.

*David Y. Chung* argued the cause for petitioner National Pork Producers Council. With him on the briefs were *Richard E. Schwartz* and *Sherrie A. Armstrong*. *Ellen Steen* entered an appearance.

*Daniel H. Lutz* and *Hope M. Babcock* were on the brief for *amici curiae* American Lung Association and American Thoracic Society in support of petitioners Waterkeeper Alliance, et al.

*Jonathan Skinner-Thompson* and *Erica M. Zilioli*, Attorneys, U.S. Department of Justice, argued the causes for respondent. With them on the brief was *John C. Cruden*, Assistant Attorney General. *Sue S. Chen* and *Cynthia J. Morris*, Attorneys, U.S. Department of Justice, entered appearances.

*Eve C. Gartner* and *Jonathan J. Smith* were on the brief for intervenors-respondents Waterkeeper Alliance, et al.

*Richard E. Schwartz* and *David Y. Chung* were on the brief for intervenor-respondent U.S. Poultry and Egg Association. *Sherrie A. Armstrong* and *James T. Banks* entered appearances.

Before: BROWN and SRINIVASAN, *Circuit Judges*, and WILLIAMS, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* WILLIAMS.

Concurring opinion filed by *Circuit Judge* BROWN.

WILLIAMS, *Senior Circuit Judge*: Anyone with a pet knows firsthand that raising animals means dealing with animal waste. But many of us may not realize that as the waste breaks down, it emits serious pollutants—most notably ammonia and hydrogen sulfide. While those emissions are miniscule for pet owners, they can be quite substantial for farms that have hundreds or thousands of animals.

Two provisions of federal law—sections of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA") and the Emergency Planning and Community Right-to-Know Act of 1986 ("EPCRA")—require parties to notify authorities when large quantities of hazardous materials (such as ammonia or hydrogen sulfide) are released into the environment. See 42 U.S.C. § 9603 (CERCLA); *id*. § 11004 (EPCRA). On learning of such a release, the EPA has broad powers to take remedial actions or order further monitoring or investigation of the situation. See *id*. § 9604.

In 2008 the EPA issued a final rule that generally exempts farms from CERCLA and EPCRA reporting requirements for air releases from animal waste. ("Air releases" refer only to emissions made into the air, rather than into water or soil.) The EPA reasoned that those "reports are unnecessary because, in most cases, a federal response is impractical and unlikely." CERCLA/EPCRA Administrative Reporting Exemption for Air Releases of Hazardous Substances from Animal Waste at Farms, 73 Fed. Reg. 76,948, 76,956/1 (Dec. 18, 2008) ("*Final Rule*"). In a change from the proposed rule, the EPA somewhat limited the exemption. Commenters had expressed a "desire to receive information regarding releases from large concentrated animal feeding operations," known as "CAFOs," which generally house thousands or even tens of thousands of animals. In response, the EPA retained the reporting requirement for CAFOs under EPCRA, which, as we'll see in more detail later, has a public-disclosure requirement that's missing from the relevant CERCLA provisions. See *id*. at 76,950/2; see also *id*. at 76,952/1-2, 76,953/3; (CAFO thresholds).

A number of environmental groups objected, claiming that the *Final Rule* ran afoul of the underlying statutes (and was therefore outside the EPA's delegated authority). The

dispute brings into play our longtime recognition that agencies have "implied *de minimis* authority to create even certain categorical exceptions to a statute 'when the burdens of regulation yield a gain of trivial or no value.'" *Public Citizen v. FTC*, 869 F.2d 1541, 1556 (D.C. Cir. 1989) (quoting *Alabama Power v. Costle*, 636 F.2d 323, 360-61 (D.C. Cir. 1979)). Although the EPA never explicitly invokes the *de minimis* exception, its analysis tracks the exception's logic. And intervenor U.S. Poultry and Egg Association specifically pointed to the agency's *de minimis* power as a reason to uphold the *Final Rule*. It thus poses the question whether the record adequately supports the EPA's conclusion that these animal-waste reports are truly "unnecessary." 73 Fed. Reg. at 76,956/1. By contrast, the environmental petitioners' argument, when framed in the language of *Alabama Power*, is essentially that the reports "provide benefits, in the sense of furthering the regulatory objectives." 636 F.2d at 361. In light of the record, we find that those reports aren't nearly as useless as the EPA makes them out to be. (We do not address the potential questions of whether the reports' costs outweigh their benefits and whether the exact statutory language (discussed below) authorizes an exception for measures failing a cost/benefit analysis; the EPA makes no claim for such a reading of the statute.) We therefore grant Waterkeeper's petition and vacate the *Final Rule*.

* * *

Congress has long sought to ensure that federal, state, and local authorities can adequately respond when hazardous chemicals threaten public safety or the environment. CERCLA gives federal authorities (generally the EPA) broad power to investigate and respond to actual or threatened releases of hazardous substances. See 42 U.S.C. § 9604. And since the EPA can't respond to releases it doesn't know about, § 103 of CERCLA requires parties to immediately notify the

National Response Center ("NRC") of any release of a hazardous substance over a threshold set by the EPA—known in regulatory speak as the "reportable quantity." See *id.* § 9603; *Fertilizer Institute v. EPA*, 935 F.2d 1303, 1306 (D.C. Cir. 1991). The NRC, which is staffed by the U.S. Coast Guard and "acts as the single [federal] point of contact for all pollution incident reporting," 40 C.F.R. § 300.125(a), must "convey the notification expeditiously to all appropriate Government agencies, including the Governor of any affected State," 42 U.S.C. § 9603(a). After receiving a report from the NRC, the EPA determines if a response is appropriate. See 40 C.F.R. § 300.130(c).

EPCRA has a parallel reporting mandate, except that it requires the relevant parties to notify state and local (rather than federal) authorities whenever covered pollutants (which it refers to as "extremely hazardous substances") are released into the environment. See 42 U.S.C. § 11004; see also *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 86 (1998).

The parties here focus on two of the hazardous substances emitted by animal waste as it decomposes—ammonia and hydrogen sulfide. (There are other such substances (e.g., nitrous oxide, methane, volatile organic compounds), see 73 Fed. Reg. at 76,950/2-3; see also NATIONAL RESEARCH COUNCIL OF THE NATIONAL ACADEMIES, AIR EMISSIONS FROM ANIMAL FEEDING OPERATIONS: CURRENT KNOWLEDGE, FUTURE NEEDS 50-56 (2003) ("National Research Council Report"), but we need not address them.) The EPA has classified ammonia and hydrogen sulfide as both CERCLA "hazardous substances" and EPCRA "extremely hazardous substances"; the EPA set the reportable quantity for each at 100 pounds per day. See 40 C.F.R. § 302.4(a) (CERCLA); *id.* pt. 355 App. A (EPCRA). None of the parties contends that the daily emissions of commercial farms fall below that threshold.

There appears to have been no clear resolution of the best way to measure these releases, which after all do not come conveniently out of a smokestack. See National Research Council Report at 2, 99-101; *Draft Air Emissions Estimating Methodologies for Animal Feeding Operations*, EPA, https://www.epa.gov/afos-air/draft-air-emissions-estimating-methodologies-animal-feeding-operations (last visited Mar. 24, 2017). The statute accommodates the problem a bit by providing for annual notice of so-called "continuous release[s]," 42 U.S.C. § 9603(f)(2), i.e., releases that are "continuous and stable in quantity and rate," 40 C.F.R. § 302.8(a), subject to a requirement of special notification for a "statistically significant increase in the quantity . . . above that previously reported," 42 U.S.C. § 9603(f)(2), which the EPA has defined as an increase "above the upper bound of the reported normal range," 40 C.F.R. § 302.8(b).

In December 2007, the EPA proposed exempting farms from CERCLA and EPCRA reporting of air releases from animal waste. See CERCLA/EPRCRA Administrative Reporting Exemption for Air Releases of Hazardous Substances from Animal Waste, 72 Fed. Reg. 73,700 (proposed Dec. 28, 2007) ("*Proposed Rule*"). The EPA noted that it had never taken response action based on notifications of air releases from animal waste. *Id*. at 73,704/2. Nor could the Agency "foresee a situation where [it] would take any future response action as a result of such notification[s] . . . because in all instances the source (animal waste) and nature (to the air over a broad area) are such that on-going releases makes an emergency response unnecessary, impractical and unlikely." *Id*. The EPA specifically requested comments "on whether there might be a situation where a response would be triggered by such a notification of the release of hazardous substances to the air from animal waste at farms, and if so, what an appropriate response would be." *Id*. at 73,704/3-73,705/1.

The EPA finalized that proposed exemption on December 18, 2008. 73 Fed. Reg. at 76,948. So far as CERCLA authority is concerned, the *Final Rule* (like the *Proposed Rule*) exempts all farms from reporting air releases from animal waste. None of the public comments changed the EPA's view that those reports "are unnecessary because, in most cases, a federal response is impractical and unlikely (*i.e.*, [the EPA] would not respond to them since there is no reasonable approach for the response)." *Id*. at 76,956/1. But public comments seeking information about emissions from the largest farms (so-called CAFOs), led the EPA to carve CAFOs out of its EPCRA exemption. *Id*. at 76,952/3-76,953/1. (A CAFO is a farm that "stables or confines" more than a certain (relatively large) number of animals—for example, more than 1,000 cattle, 10,000 sheep, or 55,000 turkeys. *Id*. at 76,959-60.) The *Final Rule* thus requires CAFOs to continue reporting air emissions under EPCRA, but not under CERCLA; other farms are exempt from both.

Environmental and agricultural groups challenged the *Final Rule*. The environmentalists—the Waterkeeper Alliance, the Sierra Club, the Humane Society of the United States, the Environmental Integrity Project, and the Center for Food Safety (for ease of reference we'll call them "Waterkeeper")—principally argue that CERCLA and EPCRA don't permit the EPA to grant reporting exemptions, but instead require reports of any and all releases over the reportable quantity. The *Final Rule* is, in Waterkeeper's view, arbitrary to boot because it treats air releases from animal waste at farms more favorably than those from other sources (like a leaky ammonia tank) or other locations (like animal waste at zoos, circuses or slaughterhouses). The National Pork Producers Council, on the other hand, argues that the *Final Rule*'s CAFO carve-out can't stand because it was based on a factor, the public's desire for information, which the Council argues is irrelevant to the statutory purpose

of facilitating emergency response. See, e.g., *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

\* \* \*

We start with a jurisdictional issue posed by the two statutes' unusual relationship. Absent a specific statutory provision assigning review to the court of appeals, a challenge to agency action must go first to district court. See *Int'l Brotherhood of Teamsters v. Peña*, 17 F.3d 1478, 1481 (D.C. Cir. 1994). But in CERCLA Congress gave this court direct (and exclusive) jurisdiction over CERCLA rules. See 42 U.S.C. § 9613(a). Thus the congressional allocation of jurisdiction is no bar to our hearing the CERCLA-based challenges to the *Final Rule*.

The *Final Rule*, however, wasn't limited to CERCLA; it relied on EPCRA too. EPCRA has no judicial review provision and therefore challenges under it must ordinarily be brought in district court. See *Barrick Goldstrike Mines, Inc. v. Browner*, 215 F.3d 45, 47 (D.C. Cir. 2000). But where, as here, a single agency action relies on multiple statutory bases, it would be a wasteful exaltation of form over substance to require piecemeal challenges in various courts. We thus commonly examine the entire agency action in a "comprehensive and coherent fashion" so long as at least one of the statutes provides for our direct review. *Shell Oil Co. v. FERC*, 47 F.3d 1186, 1195 (D.C. Cir. 1995); contra *Loan Syndications & Trading Ass'n v. SEC*, 818 F.3d 716, 723 (D.C. Cir. 2016) (finding we lacked jurisdiction where the statute providing essential authority, as acknowledged by the parties, did not provide for direct appellate review). Since CERCLA does precisely that, jurisdiction doesn't seem a problem.

Hold your horses, responds the EPA. It argues that while of course we *could* hear a consolidated CERCLA/EPCRA challenge, Waterkeeper lacks standing to challenge the CERCLA portions of the *Final Rule* because while both statutes require reporting, CERCLA (unlike EPCRA) has no requirement of *disclosure*. Thus, in the EPA's view, the CERCLA portion of the rule inflicts no informational injury on Waterkeeper. We disagree.

A plaintiff suffers an "injury in fact" when agency action cuts him off from "information which must be publicly disclosed pursuant to a statute." *FEC v. Akins*, 524 U.S. 11, 21 (1998). Given the longstanding rule that for standing purposes we assume the merits in favor of the plaintiff, *Parker v. District of Columbia*, 478 F.3d 370, 377 (D.C. Cir. 2007), the upshot of *Akins* is that the plaintiff must assert "a view of the law under which the defendant (or an entity it regulates) is obligated to disclose certain information that the plaintiff has a right to obtain," *Am. Soc. for Prevention of Cruelty to Animals v. Feld Entertainment, Inc.*, 659 F.3d 13, 22-23 (D.C. Cir. 2011). On this line of analysis, the question is whether a reporting mandate under CERCLA triggers a requirement of public disclosure. If so, exempting a release from the mandate extinguishes the corresponding disclosure.

Because CERCLA itself doesn't require disclosure, the EPA argues there can't be an injury. But due to the complex interplay between CERCLA and EPCRA, the EPA's allegedly unlawful CERCLA exemption reduces the information that must be publicly disclosed under EPCRA. As a result Waterkeeper (and others) who previously sought that information no longer have a statutory right to access it. For the purpose of standing, that's injury enough.

In drafting the EPCRA reporting requirements, Congress expressly tied them to CERCLA's. Repeatedly referring back to CERCLA, Congress set two of the three notification provisions in its new state-targeted measure (EPCRA) to require reports whenever the "release [also] requires a notification under section 103(a) of CERCLA," 42 U.S.C. §§ 11004(a)(1), (a)(3). In other words, a release that triggers the CERCLA duty also automatically trips the EPCRA reporting requirements in subsections (1) and (3) of § 11004(a). And under subsection (2), the remaining notice provision, even a release that "is not subject to the notification requirements under section 103(a) of CERCLA" requires EPCRA reporting when it "occurs in a manner which would require notification under section 103(a) of CERCLA." *Id.* § 11004(a)(2). Thus all of EPCRA's reporting mandates are piggybacked on the CERCLA mandates in one form or another. And once EPCRA reporting is required, EPCRA goes on to mandate that the information from those reports be disclosed to the general public. See 42 U.S.C. § 11044(a); see also *Ctr. for Biological Diversity, Inc. v. BP Am. Production Co.*, 704 F.3d 413, 429 (5th Cir. 2013). (Of course § 11044(a) only requires disclosure of EPCRA "followup emergency notice[s]," but that's a meaningless technicality since § 11004(c) requires those "followup emergency notice[s]" to "set[] forth" the information from the initial notices that preceded them.) Though slightly roundabout, a CERCLA reporting mandate does, in fact, trigger a public disclosure requirement.

The *Final Rule*, by cutting back on CERCLA reporting requirements, had the automatic effect of cutting back on EPCRA reporting and disclosure requirements. It thus deprives Waterkeeper of information, the public disclosure of which would otherwise be required by EPCRA. Because we find informational standing exists on this basis, we need not

reach Waterkeeper's remaining theories of injury and instead proceed to the merits.

\* \* \*

We review the *Final Rule* for reasonableness under the familiar standard of *Chevron, USA, Inc. v. NRDC, Inc.*, 467 U.S. 837 (1984), "which . . . means (within its domain) that a 'reasonable agency interpretation prevails.'" *Northern Natural Gas Co. v. FERC*, 700 F.3d 11, 14 (D.C. Cir. 2012) (quoting *Entergy Corp. v. Riverkeeper, Inc.*, 556 U.S. 208, 218 n. 4 (2009)). Of course, "if Congress has directly spoken to an issue then any agency interpretation contradicting what Congress has said would be unreasonable." *Entergy*, 556 U.S. at 218 n.4.

Rather than identifying particular text that's ambiguous, the EPA points to provisions setting forth *unrelated* exemptions and ones giving the EPA authority to set reportable quantities. It says that these "collectively create ambiguity" as to whether the EPA can create *new* exemptions like those in the *Final Rule*. Resp't Br. at 34. That conclusion doesn't follow from the premise. Consider the statutory exemptions that the EPA relies upon. No report is required for releases of engine exhaust, certain nuclear material, the normal application of fertilizer, or those that expose persons *solely* within a workplace (i.e., those that don't escape into the broader environment). 42 U.S.C. § 9601(22). CERCLA similarly exempts from reporting the application of federally-registered pesticides, releases authorized under a federal environmental statute or ones that are already reported to the NRC under the Solid Waste Disposal Act. *Id.* §§ 9603(a), (e), (f)(1). And as we saw earlier it adjusts the reporting requirements for so-called "continuous release[s]," *id.* § 9603(f)(2), i.e., those releases

that are "continuous and stable in quantity and rate," 40 C.F.R. § 302.8(a).

To be sure, the fact that Congress thought to write certain exceptions into the statutes doesn't necessarily mean it meant to bar all others. The canon of *expressio unius est exclusio alterius* is "an especially feeble helper in an administrative setting, where Congress is presumed to have left to reasonable agency discretion questions that it has not directly resolved." *Cheney R. Co. v. ICC*, 902 F.2d 66, 69 (D.C. Cir. 1990). Had Congress done nothing more than place certain exemptions in these statutes we might have reasonably concluded that the EPA had discretion to fashion other exemptions consistent with the statutory purposes. Indeed we did precisely that in *Texas Rural Legal Aid, Inc. v. Legal Services Corp.*, where we held that statutory provisions barring an agency from supporting certain types of litigation (school desegregation and abortion) didn't preclude the agency from creating an additional bar precluding redistricting litigation. 940 F.2d 685, 694 (D.C. Cir. 1991). But here Congress paired those specific exemptions with a sweeping reporting mandate. It made clear that the statutes require notification of "*any* release . . . of a hazardous substance . . . in quantities equal to or greater than" the reportable quantities authorized under § 9602. 42 U.S.C. § 9603(a) (emphasis added) (CERCLA); see also *id.* §§ 11004(a)(1), (a)(3) (EPCRA report required when release requires notice under CERCLA). Read together those statutory provisions set forth a straightforward reporting requirement for any non-exempt release (over the reportable quantity). See *New York v. EPA*, 443 F.3d 880, 885 (D.C. Cir. 2006). Conspicuously missing is any language of delegation, such as that reports be "as appropriate," "effective," "economical," or made "under circumstances to be determined by the EPA."

That brings us to the next set of provisions—permitting the EPA to set reportable quantities and adopt necessary regulations. Admittedly Congress gave the EPA broad authority to designate *additional* hazardous substances and establish reportable quantities. See 42 U.S.C. § 9602(a) (CERCLA); see also *id*. § 11002(a) (similar authority under EPCRA). And both statutes provide the EPA with general rulemaking authority "to promulgate any regulations necessary to carry out the[ir] provisions." *Id*. § 9615 (CERCLA); see also *id*. §11048 (EPCRA). But those general grants of rulemaking authority don't tell us much about whether the specific rule in question passes muster.

While none of those provisions even hints at the type of reporting exemption the EPA adopted in the *Final Rule*, the EPA extracts from them a notion that Congress meant to "avoid[] duplication of effort . . . and minimiz[e] the burden on both regulated entities and government response agencies." Resp't Br. at 33. Perhaps. But as we've long made clear, "[a]gencies are . . . 'bound, not only by the ultimate purposes Congress has selected, but by the means it has deemed appropriate, and prescribed, for the pursuit of those purposes.'" *Colorado River Indian Tribes v. Nat'l Indian Gaming Comm'n*, 466 F.3d 134, 139-40 (D.C. Cir. 2006) (quoting *MCI Telecomms. Corp. v. AT&T*, 512 U.S. 218, 231 n.4 (1994)). We have no doubt that a desire for efficiency motivated some of the exceptions Congress provided, but those concerns don't give the agency carte blanche to ignore the statute whenever it decides the reporting requirements aren't worth the trouble. See *Util. Air Regulatory Grp. v. EPA*, 134 S. Ct. 2427, 2446 (2014) ("[A]n agency may not rewrite clear statutory terms to suit its own sense of how the statute should operate.").

Agencies are not, however, "helpless slaves to literalism." *Public Citizen v. Young*, 831 F.2d 1108, 1112 (D.C. Cir.

1987). The *de minimis* doctrine is an expression of courts' reluctance "to apply the literal terms of a statute to mandate pointless expenditures of effort," and is thus a "cousin" of the doctrine permitting courts to avoid absurd results in the face of a statute's seemingly plain meaning. *Alabama Power*, 636 F.2d at 360 & n.89. But that *de minimis* power is strictly limited; an agency can't use it to create an exception where application of the literal terms would "provide benefits, in the sense of furthering the regulatory objectives, but the agency concludes that the acknowledged benefits are exceeded by the costs." *Id*. at 360-61.

The EPA purported to find an absence of regulatory benefit. It asserted that the animal-waste "reports are unnecessary because, *in most cases*, a federal response is impractical and unlikely." 73 Fed. Reg. at 76.956/1 (emphasis added). The qualification suggests that at least some circumstances would call for a response. Other portions of the *Final Rule*, however, seem to reject that notion and instead state simply that the EPA could "not foresee a situation where the Agency would initiate a response action as a result of such notification." *Id*. at 76,953/2.

But commenters in the rulemaking claimed to foresee just such situations. They put before the EPA a good deal of information, not refuted by the EPA, suggesting scenarios where the reports could be quite helpful in fulfilling the statutes' goals. Specifically, commenters explained that "when [manure] pits are agitated for pumping," hydrogen sulfide, methane, and ammonia "are rapidly released from the manure and may reach toxic levels or displace oxygen, increasing the risk to humans and livestock." 73 Fed. Reg. at 76,957/2; see also *Manure Gas Dangers*, FARM SAFETY ASS'N, http://nasdonline.org/static_content/documents/48/d001616.pdf (last visited Mar. 24, 2017). That risk isn't just theoretical; people have become seriously ill and even died as

a result of pit agitation. See K.J. Donham, *Community & Occupational Health Concerns in Pork Production: A Review*, 88 J. ANIM. SCI. 102, 107 (2010), available at https://www.animalsciencepublications.org/publications/jas/pdfs/88/13/E102 (cited by Amici Br. at 12 & n.55). (One might reasonably then ask why bother agitating at all. The answer—at least according to the EPA—is that it's necessary to maintain storage in liquid manure storage systems. See *NPDES Permit Writers' Manual for Concentrated Animal Feeding Operations* 5-15, EPA (Feb. 2012), https://www.epa.gov/sites/production/files/201510/documents/cafo_permitmanual_entire.pdf.) The EPA didn't dispute that "various pit pumping techniques may cause emissions to exceed reportable quantities" (truly an understatement), but dismissed the comments by simply noting "it is unclear what response the commenter had in mind." Joint App'x at 626. The *Final Rule* added that "based on the EPA's experience, the Agency would *rarely* respond to such scenarios." 73 Fed. Reg. at 76,957/3 (emphasis added). Although we (like the EPA) don't know what particular response the commenter had in mind, the EPA suggested at oral argument that one option might be requiring "some sort of change in the farm's . . . waste management system [to] eliminate the risk." Oral Arg. Tr. at 32:13-14. That hardly sounds "impractical." And as we'll see in a minute, such responses appear to be within the EPA's remedial powers.

Commenters also pointed to the role of information in enabling responses by local officials. The National Association of Clean Air Agencies ("Clean Air Agencies") (which represents hundreds of air pollution control agencies) submitted Congressional testimony from an Iowa regulator saying that the *Final Rule* "prevent[s] local, state and federal emergency responders from having critical information about potentially dangerous releases" and limits the ability of federal or state authorities to take action through

"investigations or clean-up[s]" or "issuing abatement orders." *Human Health, Water Quality, and Other Impacts of the Confined Animal Feeding Operation Industry: Hearing Before the S. Env't & Pub. Works Comm.*, 110th Cong. 1 (2007) (statement of Catharine Fitzsimmons, Chief of the Air Quality Bureau of the Iowa Dep't of Natural Resources). Likewise, the National Association of SARA Title III Program Officials ("SARA Title III Officials") (which is made up of members of local and state emergency planning commissions) discussed how emergency commissions could use those reports when responding to citizen complaints or genuine emergencies. It explained:

> The 911 call that comes in from a member of the public in the dark of night reporting a foul or chemical odor rarely contains information on the source. The responders are forced to guess at that source as they ga[u]ge their response. "Immediate" release reporting by facilities under EPCRA provides crucial information to those responders. Without such information responders are forced to blindly drive through an area not knowing what they are looking for—is it a vehicle accident, a facility release or something worse will be the question in their minds.

Comment Letter from Timothy R. Gablehouse, Pres., Nat'l Ass'n of SARA Title III Program Officials, to Superfund Docket, U.S. EPA at 2 (Mar. 27, 2008). Then-Oklahoma Attorney General Drew Edmondson also invoked the benefits of alerting local agencies. Comment Letter from W.A. Drew Edmondson, Okla. Att'y Gen., to Superfund Docket, U.S. EPA at 3 (Mar. 27, 2008).

Whatever the EPA's past experience in responding to mandated information may have been, it plainly has broad authority to respond. CERCLA authorizes both removal and remedial actions. See 42 U.S.C. § 9604(a)(1); see also *Montrose Chem. Corp. of California v. EPA*, 132 F.3d 90, 92 n.3 (D.C. Cir. 1998). "Removal" includes both cleanup of hazardous substances from the environment and broad authority to institute monitoring, investigative and preventative activities designed to evaluate and minimize the impact of possible releases. See 42 U.S.C. §§ 9601(23), 9604(b)(1) (authorizing "investigations, monitoring, surveys, testing, and other information gathering"). "Remedial actions" are ones designed to permanently prevent or minimize the risk of a release. See *id.* § 9601(24). They can range from enormously invasive measures (like permanently relocating residents) to relatively minor ones (like digging protective trenches or requiring covers). See *id.*

Thus the comments undermine the EPA's primary justification for the *Final Rule*—namely, that notifications of animal-waste-related releases serve no regulatory purpose because it would be "impractical or unlikely" to respond to such a release. 73 Fed. Reg. at 76,950/1. It's not at all clear why it would be impractical for the EPA to investigate or issue abatement orders (as suggested by the Clean Air Agencies) in cases where pumping techniques or other actions lead to toxic levels of hazardous substances such as hydrogen sulfide. And the SARA Title III Officials provide at least one way that local or state authorities might use the CERCLA release reports—to narrow an investigation when they get a phone call reporting a suspicious smell or similarly vague news of possibly hazardous leaks.

The record therefore suggests the potentiality of some real benefits. Of course it's possible that these are outweighed by the costs, which the EPA estimates as substantial. See 73

Fed. Reg. at 76,958/1 (estimating that, over ten years, the *Final Rule* would save farms more than a million hours and more than $60 million in compliance costs and cut out roughly 160,000 hours and $8 million in government costs related to those reports). But as we have noted, such facts (assuming their correctness) are not enough to support application of the *de minimis* exception.

\* \* \*

Because the EPA's action here can't be justified either as a reasonable interpretation of any statutory ambiguity or implementation of a *de minimis* exception, we grant Waterkeeper's petition and vacate the *Final Rule*. That necessarily moots Pork Producers' challenge to the CAFO carve-out; we therefore dismiss their petition.

*So ordered.*

BROWN, *Circuit Judge*, concurring:  I join in the Panel Opinion because "the *Final Rule* ran afoul of the underlying statutes (and was therefore outside the EPA's delegated authority)."  Op. 3.  To reach this result, the court dances around the familiar *Chevron* two-step with the following formulation:  "Of course, 'if Congress has directly spoken to an issue then any agency interpretation contradicting what Congress has said would be unreasonable.'"  Op. 11 (quoting *Entergy Corp. v. Riverkeeper, Inc.*, 556 U.S. 208, 218 n.4 (2009)).  I assume this reasoning casts no aspersions on the first step of *Chevron*.  *But see United States v. Home Concrete & Supply, LLC*, 132 S. Ct. 1836, 1846 n.1 (2012) (Scalia, J., concurring in part and concurring in the judgment).

*Entergy Corp.* merely establishes an agency's *un*reasonable statutory interpretation is outside the scope of any statutory ambiguity.  The decision does *not* comment on the situation in which a court might find an agency's interpretation reasonable *without* satisfying *Chevron* Step One, *i.e.*, without a *judicial* determination that the "traditional tools" of interpretation identify a statutory ambiguity that, in turn, authorizes agency action on the "precise question at issue."  *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842, 843 n.9 (1984).

This case extends no further than what *Entergy Corp.* established.  As the Panel acknowledges, EPA set forth *no* statutory ambiguity authorizing its *Final Rule*.  Op. 11.  Under Step One, this ends the matter.  *See, e.g.*, *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986) (holding "an agency literally has no power to act . . . unless and until Congress confers power upon it").  Step One would decompose if EPA's premise here were accepted:  An agency can take "unrelated" statutory provisions that, in its view, "collectively create ambiguity," and command deference because a court finds the agency's interpretation "reasonable" at Step Two.  *See* Op. 11.

*Chevron*'s "reasonableness" inquiry could (and should) be governed by statutory text, but Step Two jurisprudence reveals statutory text need not play much of a role at all—let alone a dispositive one. *See, e.g.*, Stephen G. Breyer, et al., ADMINISTRATIVE LAW AND REGULATORY POLICY: PROBLEMS, TEXT, AND CASES 359 (7th ed. 2011) ("The weight of scholarly opinion endorses an equation of step two with arbitrary and capricious review." Such review is "not an inquiry into congressional instructions, but an assessment of whether the agency's decision is reasonable on the merits and not, in the [Supreme] Court's words, arbitrary or capricious in substance."). This is why Step One is so critical. For all its potential for manipulation, it is *Chevron* Step One where "[t]he court's task is to fix the boundaries of delegated authority, an inquiry that includes defining the range of permissible criteria. . . . [T]he judicial role is to specify what the statute cannot mean, and some of what it must mean, but not all that it does mean." Henry P. Monaghan, Marbury *and the Administrative State*, 83 COLUM. L. REV. 1, 27–28 (1983); *see also* Gerald L. Neuman, *Law Review Articles that Backfire*, 21 U. MICH. J.L. REFORM 697, 711–12 (1988) ("Monaghan's thesis reappeared, without citation, as the core of Justice Stevens's new approach to statutory interpretation in [*Chevron*].").

Truncating the *Chevron* two-step into a one-step "reasonableness" inquiry lets the judiciary leave its statutory escort to blow on an agency's dice. "It isn't fair. It isn't nice." FRANK SINATRA, *Luck Be A Lady*, *on* SINATRA '65: THE SINGER TODAY (Reprise Records 1965). In fact, some advocates of a one-step reasonableness approach appeal to the judiciary's fear of commitment—promising that courts can avoid "ascertain[ing] whether the statute has a single, clear meaning before deciding whether the agency's interpretation is reasonable." *See* Matthew C. Stephenson & Adrian Vermeule, Chevron *Has Only One Step*, 95 VA. L. REV. 597, 605 (2009).

Congress is out of the picture altogether. When all that matters is aligning judicial and administrative views of reasonableness, and reasonableness at Step Two need not be primarily or solely determined by the "traditional tools" of statutory interpretation, there is no incentive to petition the legislature for statutory clarity. Agencies are free to experiment with various interpretations, and courts are free to avoid determining the meaning of statutes. *See* Kenneth A. Bamberger & Peter L. Strauss, Chevron*'s Two Steps*, 95 VA. L. REV. 611, 618–19 (2009).

An Article III renaissance is emerging against the judicial abdication performed in *Chevron*'s name. If a court could purport fealty to *Chevron* while subjugating statutory clarity to agency "reasonableness," textualism will be trivialized. "For whatever the *agency* may be doing under *Chevron*, the problem remains that *courts* are not fulfilling their duty to interpret the law." *Guiterrez-Brizuela v. Lynch*, 834 F.3d 1142, 1152–53 (10th Cir. 2016) (Gorsuch, J., concurring).

I join in the Panel Opinion because it does not extend to the situation in which an agency's statutory interpretation is found to be "reasonable" without a court first determining the statutory bounds of agency authority. But if *Chevron*'s two-step inquiry can be collapsed into one "reasonableness" inquiry no different than current Step Two jurisprudence, there is yet another reason to question *Chevron*'s consistency with "the judicial department['s]" "emphatic[]" "province and duty . . . to say what the law is." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803).