CARL E. STEWART, Chief Judge, dissenting:
Over the last forty years, the retirement-investment market has experienced a dramatic shift toward individually controlled retirement plans and accounts. Whereas retirement assets were previously held primarily in pension plans controlled by large employers and professional money managers, today, individual retirement accounts ("IRAs") and participant-directed plans, such as 401(k)s, have supplemented pensions as the retirement vehicles of choice, resulting in individual investors having greater responsibility for their own retirement savings. This sea change within the retirement-investment market also created monetary incentives for investment advisers to offer conflicted advice, a potentiality the controlling regulatory framework was not enacted to address. In response to these changes, and pursuant to its statutory mandate to establish nationwide "standards ... assuring the equitable character" and "financial soundness" of retirement-benefit plans, 29 U.S.C. § 1001, the Department of Labor ("DOL") recalibrated and replaced its previous regulatory framework. To better regulate conflicted transactions as concerns IRAs and participant-directed retirement plans, the DOL promulgated a broader, more inclusive regulatory definition of investment-advice fiduciary under the Employee Retirement Income Security Act of 1974 ("ERISA") and the Internal Revenue Code ("the Code").
Despite the relevant context of time and evolving marketplace events, Appellants and the panel majority skew valid agency action that demonstrates an expansive-but-permissible shift in DOL policy as falling outside the statutory bounds of regulatory authority set by Congress in ERISA and the Code. Notwithstanding their qualms with these regulatory changes and the effect the DOL's exercise of its regulatory authority might have on certain sectors of the financial services industry, the DOL's exercise was nonetheless lawful and consistent with the Congressional directive to "prescribe such regulations as [the DOL] finds necessary or appropriate to carry out [ERISA's provisions]." 29 U.S.C. § 1135. Because I do not share the panel majority's concerns about the DOL's amended regulatory framework, I respectfully dissent.
I.
A comprehensive recitation of the relevant regulatory and statutory background *389 can be found in the district court's opinion. See Chamber of Commerce of the United States of America, et al. v. Hugler, et al. , 231 F.Supp.3d 152 (N.D. Tex. 2017). This appeal primarily turns on the DOL's interpretation of the parallel definitions of "investment-advice fiduciary" in ERISA and the Code. See 29 U.S.C. § 1002(21)(A)(ii) ; 26 U.S.C. § 4975(e)(3). Those provisions define an investment-advice fiduciary as one who "renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so."Id . This statutory definition deliberately casts a wide net in assigning fiduciary responsibility with respect to plan assets. See Fiduciary Rule, 81 Fed. Reg. 20,954. Thus, any person who "renders investment advice for a fee or other compensation, direct or indirect," is an investment-advice fiduciary, "regardless of whether they have direct control over the plan's assets, and regardless of their status as an investment adviser or broker under federal securities laws." Id .
For 41 years, the DOL employed a five-part test to determine whether a person is an investment-advice fiduciary under ERISA and the Code, and that test limited the reach of the statutes' prohibited transaction rules to those who rendered advice "on a regular basis," and to instances where such advice "serve[d] as a primary basis for investment decisions with respect to plan assets." See 29 C.F.R. § 2510.3-21(c)(1) (2015). This regulation "was adopted prior to the existence of participant-directed 401(k) plans, the widespread use of IRAs, and the now commonplace rollover of plan assets" from Title I plans to IRAs, thus leaving out of ERISA's regulatory reach many investment professionals, consultants, and advisers who play a critical role in guiding plans and IRA investments. Fiduciary Rule, 81 Fed. Reg. 20,946.
The rule challenged on appeal addresses these and other changes in the retirement investment advice market by, inter alia , abandoning the five-part test in favor of a definition of fiduciary that includes "recommendation[s] as to the advisability of acquiring ... investment property that is rendered pursuant to [an] ... understanding that the advice is based on the particular investment needs of the advice recipient." 29 C.F.R. § 2510.3-21(a) (2016). A "recommendation," in turn, includes a "communication that, based on its content, context, and presentation , would reasonably be viewed as a suggestion that the advice recipient engage in or refrain from taking a particular course of action." Id . § 2510.3-21(b)(1) (emphasis added). Importantly, the regulatory definition of "investment-advice fiduciary" thoroughly and specifically describes communications that would otherwise be covered "recommendations," and gives examples of interactions and relationships that, under the broad regulatory definition of fiduciary, would qualify as "recommendations" but which are not "appropriately regarded as fiduciary in nature" under ERISA and are therefore circumscribed from the regulation's definition. See 29 C.F.R. § 2510.3-21(b)-(c) (2016) ; Fiduciary Rule, 81 Fed. Reg. 20,971.[1]
*390 Appellants, organizations and associations representing businesses and financial service providers who previously fell outside the DOL's definition of fiduciary but who are now governed by certain of the rule's new regulatory requirements, challenge the expansion. The panel majority finds many of Appellants' arguments persuasive and vacates the DOL's rule as unreasonable under Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc. , 467 U.S. 837, 104 S.Ct. 2778 (1984), and as arbitrary and capricious agency action under the Administrative Procedure Act, 5 U.S.C. § 706 ("APA").[2] Because I believe the DOL's new regulations are a statutorily permissible and reasonable exercise of its regulatory authority, I would affirm the district court's judgment.
II.
As the panel majority acknowledges, the DOL's authority to implement a new definition of investment-advice fiduciary implicates the two-step analytical framework established in Chevron . "First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." Chevron , 467 U.S. at 842-43, 104 S.Ct. 2778. However, "if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." Id . at 843, 104 S.Ct. 2778 (emphasis added). The agency's view "governs if it is a reasonable interpretation of the statute-not necessarily the only possible interpretation, nor even the interpretation deemed most reasonable by the courts." Entergy Corp. v. Riverkeeper, Inc. , 556 U.S. 208, 218, 129 S.Ct. 1498, 173 L.Ed.2d 369 (2009) (emphasis in original). Importantly, a court may not substitute its own construction of a statutory provision of a reasonable interpretation made by the administrator of an agency. Chevron , 467 U.S. at 844, 104 S.Ct. 2778.
The Chevron inquiry necessarily begins with the text of the statutory definition of investment-advice fiduciary. See 29 U.S.C. § 1002(21)(A)(ii) ; 26 U.S.C. § 4975(e)(3). Contrary to the panel majority's protestation, nothing in the statutory text forecloses the DOL's current interpretation. The statute does not define the pertinent phrase "renders investment advice," and ERISA expressly authorizes the DOL to adopt regulations defining "technical and trade terms used" in the statute. 29 U.S.C. § 1135. As a matter of ordinary usage, there can be no "serious dispute" that someone who provides "[a] recommendation as to the advisability of acquiring, holding, disposing of, or exchanging, securities or other investment property," 29 C.F.R. 2510.3-21(a), is "render[ing] investment advice." See *391 Nat'l Ass'n for Fixed Annuities v. Perez , 217 F.Supp.3d 1, 23 (D.D.C. Nov. 4, 2016). Additionally, although the panel majority dismisses the use of dictionary definitions as an aid in interpreting the statutory text, plain language definitions highlight the uniformity between the statutory text and the DOL's regulations.[3] The dictionary defines "advice" as an "opinion or recommendation offered as a guide to action [or] conduct," and it defines "investment" as "the investing of money or capital in order to gain profitable returns." See Random House Dictionary of the English Language (2d ed. 1987). The DOL's interpretation of "investment advice" all but replicates those definitions by classifying as fiduciaries only those who provide "recommendations" to investors who reasonably rely on their advice and expertise. See 29 C.F.R. § 2510.3-21(a)-(c). Nothing in the phrase "renders investment advice for a fee or other compensation" suggests that the statute applies only in the limited context accepted by the panel majority.
That the text of ERISA does not unambiguously foreclose the DOL's regulatory interpretation of fiduciary satisfies step one of Chevron . Nonetheless, the panel majority reaches additional erroneous conclusions to make a case for a contrary holding. The panel majority primarily contends that the DOL's new interpretation is inconsistent with common law fiduciary standards that Congress contemplated and retained in enacting ERISA. Under those common law standards, fiduciary status turns on the existence of a relationship of trust and confidence between the fiduciary and the client, a relationship that the panel majority maintains never materializes when a financial services professional does not engage in the type of ongoing transactional relationships that plan managers and administrators traditionally do.
No one seriously challenges that the courts have, at times, looked to the common law of trusts in interpreting the nature and scope of fiduciary duties under ERISA. The Supreme Court has "recognize[d] that the [ ] fiduciary duties [found in ERISA] draw much of their content from the common law of trusts," which "governed most benefit plans before ERISA's enactment." Varity Corp. v. Howe , 516 U.S. 489, 496, 116 S.Ct. 1065 (1996). But the Court has "also recognize[d] ... that trust law does not tell the entire story," and that "ERISA's standards and procedural protections partly reflect a congressional determination that the common law of trust did not offer completely satisfactory protection." Id . at 497, 116 S.Ct. 1065. Accordingly, the Court concluded that "[i]n some instances, trust law ... offer[s] only a starting point, after which courts must go on to ask whether, or to what extent, the language of the statute, its structure, or its purposes require departure from common-law trust requirements." Id . (emphasis added).
*392 One area in which Congress has departed from the common law of trusts is with the statutory definition of "fiduciary." ERISA does not define "fiduciary" "in terms of formal trusteeship, but in functional terms of control and authority over the plan , ... thus expanding the universe of persons subject to fiduciary duties ..." Mertens v. Hewitt Assocs. , 508 U.S. 248, 262, 113 S.Ct. 2063 (1993) (emphasis added). That is, contrary to the panel majority's interpretation, Mertens recognizes that although Congress intended to incorporate the core principles of fiduciary conduct that were developed in the common law of trusts, Congress modified this approach where appropriate for employee benefit plans, including in defining who qualifies as a fiduciary under ERISA. Indeed, ten years before Mertens , a panel of this court recognized that ERISA imposes a duty on a broader class of fiduciaries than did trust law. See Donovan v. Cunningham , 716 F.2d 1455, 1464 n.15 (5th Cir. 1983) (noting that "ERISA's modifications of exiting trust law include imposition of duties upon a broader class of fiduciaries") (citing 29 U.S.C. § 1002(21) (1976) ). The panel majority now interprets Mertens very narrowly, effectively limiting its interpretation of the statutory definition of "fiduciary" to reach only plan managers, administrators, and other comparable roles. Such a holding, however, runs counter to the very clear language in Mertens , which interpreted ERISA to define fiduciaries as "not only the persons named as fiduciaries by a benefit plan ... but also anyone else who exercises discretionary control or authority over the plan's management, administration, or assets." Mertens , 508 U.S. at 262, 113 S.Ct. 2063. Under the current regime, investment advisers of the sort covered by the new regulatory definition of "investment-advice fiduciary" exercise such control. Because the text of ERISA goes beyond the common law, and because the purpose of the statute does not compel a different result, the textual rendering of "fiduciary" controls and, as explained, does not unambiguously foreclose the DOL's interpretation of "investment-advice fiduciary." See Varity Corp. , 516 U.S. at 496-97, 116 S.Ct. 1065.[4]
It is only after invoking common law trust principles that the panel majority turns to the statutory text. Instead of assessing the DOL's regulations based on the plain language of the statute, the panel majority relies on several extra-statutory sources which purportedly shed light on how an investment-advice fiduciary should be defined. In so doing, the panel majority maintains that the relevant provisions in ERISA and the Code contemplated a hard distinction between investment advisers *393 and those who merely sell retirement products, and that the DOL dispensed with this distinction in the new rule by conferring fiduciary status on one-time sellers of products.
As an initial matter, the new rule does not make one a fiduciary for selling a product without a recommendation upon which an investor might reasonably rely. See Fiduciary Rule, 81 Fed. Reg. 20,984 ; see also 29 C.F.R. § 2510.3-21(b). Thus, "if a retirement investor asked a broker to purchase a ... security, the broker would not become a fiduciary investment adviser merely because the broker ... executed the securities transaction . Such 'purchase and sales' transactions do not include any investment advice component." Id . (emphasis added). That the panel majority's primary concern is expressly addressed by the plain language of the new rule is alone enough to render unavailing any reliance on extra-statutory contemporary understandings of the term "investment advice" as inherently and necessarily distinctive from pure sales activity (which, again, the new rule does not purport to regulate). In any event, the sources cited by the panel majority independently undermine its ultimate conclusion.
The panel majority first highlights the Investment Advisers Act of 1940 ("the IAA"), which precedes the disputed regulations by some 76 years and which informed Congress's use of the phrase "renders investment advice for a fee or other compensation" in ERISA and the Code. The IAA defines an "investment adviser" as "any person who, for compensation, engages in the business of advising others, either directly or through publications or writings, as to the value of securities or as to the advisability of investing in, purchasing, or selling securities," 15 U.S.C. § 80b-2(a)(11), and specifically excludes from that definition "any broker or dealer whose performance of such services is solely incidental to the conduct of his business as a broker or dealer and who receives no compensation therefor." Id . From this, the panel majority gleans that the distinction in the IAA between "investment advisers compensated for rendering advisory services" and "salespersons compensated only for their sales" was incorporated by Congress into the concepts of ERISA. This logic is misplaced. "The distinction between advisers and brokers contained in the [IAA] was created when Congress define[d] 'investment adviser' broadly and then create[d] ... a precise exemption for broker-dealers." Perez , 217 F.Supp.3d at 26 (quoting Fin. Planning Ass'n v. S.E.C. , 482 F.3d 481, 489 (D.C. Cir. 2007) ) (internal quotations omitted). In ERISA and the Code, however, Congress omitted such an exclusion from the definition of "fiduciary." See 29 U.S.C. § 1002(21)(A) ; 26 U.S.C. § 4975(e)(3)(B). Thus, to the extent Congress had the IAA in mind as a model when it enacted the statutory definition of "fiduciary" found in ERISA, that the definitions do not exactly align, and specifically that ERISA's definition mysteriously omits any statutory exclusion of broker-dealers, counsels against construing ERISA's definition of "fiduciary" in the way advanced by the panel majority. See Perez , 217 F.Supp.3d at 26.
Additionally, the panel majority's reliance on the DOL's original regulation, SEC interpretations of "investment advice for a fee," and case law tying investment advice for a fee to "ongoing relationships between adviser and client" are similarly unavailing. First, because the DOL limited the scope of its original regulation such that it did not touch the breadth of the statutory definition of fiduciary, all interpretations rendered pursuant to that regulation will necessarily be limited in a way that the new regulation seeks to remedy. Further, that the SEC and case law have *394 interpreted investment advice for a fee as implicating ongoing relationships between an adviser and his client does not take the entire statutory provision into consideration. ERISA defines "investment-advice fiduciary" as one who renders investment advice "for a fee or other compensation , direct or indirect." 29 U.S.C. § 1002(21)(A)(ii) (emphasis added). This phrase contemplates compensation structures other than those incorporating fees, i.e. commissions, and which are built on relationships that are more than mere buyer-seller interactions, but which do not require ongoing intimate relationships.
The panel majority also emphasizes that the investment-advice provision is "bookended" by two separate definitions of fiduciary which purportedly incorporate common law trust principles and apply to individuals vested with responsibilities to manage and control the plan. From this, the panel majority extrapolates that the investment advice prong requires the existence of a "special" relationship so as to harmonize with the statutory definitions of fiduciary that come before and after it. However, that the other two prongs of the statutory definition of "fiduciary" describe those involved in managing or administering a plan provides support for the opposite conclusion. Because the other disjunctive prongs of the statutory definition already address "the ongoing management [and administration] of an ERISA plan," the panel majority's reading of the "investment advice" prong would strip that prong of independent meaning and render it superfluous. See, e.g. , U.S. v. Menasche , 348 U.S. 528, 538-39, 75 S.Ct. 513, 99 L.Ed. 615 (1955) ("It is our duty to give effect, if possible, to every clause and word of a statute.") (citation and internal quotation marks omitted).
In sum, the statutory definition of "fiduciary" does not unambiguously foreclose the DOL's updated regulatory definition of "investment-advice fiduciary." The text and structure of the statute support this conclusion, and the panel majority's reliance on common law presumptions and extra-statutory interpretations of "renders investment advice for a fee" do not upset this conclusion. Accordingly, I conclude that the DOL acted well within the confines set by Congress in implementing the challenged regulatory package, and said package should be maintained so long as the agency's interpretation is reasonable.
III.
In applying Chevron step two to cases where an agency has changed its existing policy, the court defers to the agency's permissible interpretation, but only if the agency has offered a reasoned explanation for why it chose that interpretation. See Encino Motorcars, LLC v. Navarro , --- U.S. ----, 136 S.Ct. 2117, 2125, 195 L.Ed.2d 382 (2016). Analysis at this step is analogous to the "arbitrary or capricious" standard under the APA. See Judulang v. Holder , 565 U.S. 42, 52 n.7, 132 S.Ct. 476, 181 L.Ed.2d 449 (2011).
The DOL's interpretation of "renders investment advice" is reasonably and thoroughly explained. The new interpretation fits comfortably with the purpose of ERISA, which was enacted with "broadly protective purposes" and which "commodiously imposed fiduciary standards on persons whose actions affect the amount of benefits retirement plan participants will receive." Perez , 217 F.Supp.3d at 28 (quoting John Hancock Mut. Life Ins. Co. v. Harris Tr. & Sav. Bank , 510 U.S. 86, 96, 114 S.Ct. 517 (1993) ). In light of changes in the retirement investment advice market since 1975, mentioned above, the DOL reasonably concluded that limiting fiduciary *395 status to those who render investment advice to a plan or IRA "on a regular basis" risked leaving retirement investors inadequately protected. This is especially so given that "one-time transactions like rollovers will involve trillions of dollars over the next five years and can be among the most significant financial decisions investors will ever make." Perez , 217 F.Supp.3d at 28 (citing Fiduciary Rule, 81 Fed. Reg. at 20,954 -55). Given DOL's reasoned explanation for choosing its most recent interpretation, I would hold that the agency's action passes muster under step two of Chevron .
Notwithstanding the DOL's reasoned explanation for the new regulations, the panel majority maintains that the DOL acted unreasonably and arbitrarily when it promulgated the new fiduciary rule and, in a strained attempt to justify this conclusion, the panel majority disregards the requirement of showing judicial deference under Chevron by highlighting purported issues with other provisions of the regulation. Each of the panel majority's positions fails for reasons more fully explained below.
A. PTE 84-24, the BIC Exemption, and the DOL's Exemption Authority
Beyond its qualms with the new regulatory delineations on who qualifies as an investment-advice fiduciary, the panel majority takes substantial issue with the DOL's exercise of its exemption authority to amend PTE 84-24 and create the new BIC Exemption. The DOL may supplement statutorily created exemptions by implementing new exemptions under the prohibited transaction rules, which apply to retirement investment instruments under Titles I and II and "supplement[ ] the fiduciary's general duty of loyalty to the plan's beneficiaries ... by ... barring certain transactions deemed 'likely to injure the pension plan.' " Harris Tr. & Sav. Bankv. Salomon Smith Barney, Inc., 530 U.S. 238, 241-42, 120 S.Ct. 2180, 147 L.Ed.2d 187 (2000). ERISA and the Code authorize the DOL to adopt "conditional or unconditional exemption[s]" for otherwise prohibited transactions, the only limitation on this expansive authority being that the exemption must be "administratively feasible," "in the interest of the plan and its participants and beneficiaries," and "protective of the rights of [plan] participants and beneficiaries." 29 U.S.C. § 1108(a) ; 26 U.S.C. § 4975(c)(2). Consistent with this broad authority, the DOL granted exemptions for otherwise prohibited transactions in the new regulatory package, but conditioned those exemptions on, among other things, a requirement that the fiduciary take on the same duties of "prudence" and "loyalty" that bind Title I fiduciaries. See Fiduciary Rule, 81 Fed. Reg. 21,077, 21,176. This condition is only truly meaningful as applied to advisers under Title II, which must, under the new rule, satisfy new requirements to engage in transactions that would otherwise be prohibited.
The panel majority concludes that because the DOL is given no direct statutory authority to regulate IRA plan fiduciaries under Title II, and because the DOL has used its exemption authority to "subject most of these newly regulated actors and transactions to a raft of affirmative obligations," the agency necessarily abused its exemption authority. However, the panel majority's interpretation of the DOL's use of its exemption authority all but ignores the statutory directive given to the DOL to create "conditional or unconditional" exemptions from otherwise prohibited transactions. ERISA and the Code do not qualify the form conditions must take or limit the scope of the DOL's exemption authority to mirror specific exemptions created by *396 Congress, leaving it up to the agency to decide whether to impose affirmative or negative conditions (or none at all) on exemptions from prohibited transactions. And Congress's imposition of broad regulatory power over Title I plans is not dispositive of whether Congress intended to foreclose the DOL from requiring adherence to those duties as a condition of granting an exemption.[5]
Further, the panel majority accepts Appellants' contention that the BIC Exemption creates a private right of action in contravention of Alexander v. Sandoval , 532 U.S. 275, 121 S.Ct. 1511, 149 L.Ed.2d 517 (2001) by requiring the inclusion of specific contractual terms as a condition of qualifying for and receiving the prohibited transaction exemption. However, the BIC Exemption does not create a private right of action. "[I]t merely dictates terms that otherwise-conflicted financial institutions must include in written contracts with IRA and other [Title II] owners in order to qualify for the exemption." Perez , 217 F.Supp.3d at 36. Any action brought to enforce the terms of the written contract created pursuant to the BIC Exemption would be brought under state law, and state law would ultimately control the enforceability of any of the required contractual terms.
The panel majority also urges that in moving fixed indexed annuities from PTE 84-24 to the BIC Exemption, the DOL failed to account for state regulation of sales of annuities. See Maj. Opn. at 385 (citing American Equity Inv. Life Ins. Co. v. S.E.C. , 613 F.3d 166 (D.C. Cir. 2010) ). However, ERISA contains no statutory requirement that the DOL check for efficiency when changing which annuities qualify for a specific exemption, as was the case in American Equity . Further, before making the relevant amendments to the exemptions, the DOL comprehensively assessed existing securities regulation for variable annuities, state insurance regulation of all annuities, and consulted with numerous government and industry officials, including the SEC, the Department of the Treasury, and the Consumer Financial Protection Bureau, among others. The DOL found the protections prior to the current rulemaking insufficient to protect investors and acted within its prerogative to modify the regulatory regime as it deemed necessary.
Similarly, the panel majority observes that because § 913(g) of the Dodd-Frank *397 Wall Street Reform and Consumer Protection Act, Pub. Law. No. 111-203, 124 Stat. 1376 (2010) ("Dodd-Frank Act") prohibits the SEC from adopting a standard of conduct that disallows commissions for broker-dealers, it is implausible that Congress intended to allow the DOL, through ERISA, to promulgate a regulation that would do just that. As an initial matter, the DOL's final rules do not prohibit commissions for broker-dealers. The rules only modify already-existing exemptions from prohibited transactions. As has been the case, if a person or entity qualifies for an exemption, the applicant can still receive commissions and other forms of third party compensation. Further, "[n]othing in the Dodd-Frank Act indicates that Congress intended to preclude the DOL's regulation of fiduciary investment advice under ERISA or its application of such a regulation to securities brokers or dealers." Fiduciary Rule, 81 Fed. Reg. 20,990. In fact, "[the] Dodd-Frank Act specifically directed the SEC to study the effectiveness of existing ... regulatory standards of care under other federal and state authorities," § 913(b)(1), (c)(1), and "[t]he SEC has ... consistently recognized ERISA as an applicable authority in this area, noting that advisers entering into performance fee arrangements with employee benefit plans covered by [ERISA] are subject to the fiduciary responsibility and prohibited transaction provisions of ERISA." Id . (internal quotation marks omitted).
B. Questions of Deep "Economic and Political Importance"
Finally, the panel majority's contention that the DOL is using a "long-extant" statute to implement an "enormous and transformative expansion in regulatory authority without clear congressional authorization" is misplaced. Maj. Opn. at 387. The panel majority relies on several Supreme Court cases in support of this position but fails to recognize a meaningful distinction between those opinions and the case sub judice : in each of these cases, the relevant agency clearly exceeded the scope of delegation created by the enabling statute. See Util. Air Regulatory Grp. v. EPA , --- U.S. ----, 134 S.Ct. 2427, 2444, 189 L.Ed.2d 372 (2014) (holding that "it would be patently unreasonable-not to say outrageous-for [the] EPA to insist on seizing expansive power that it admits the statute is not designed to grant ," and finding that a "long-extant statute [did not give EPA] an unheralded power to regulate a significant portion of the American economy") (emphasis added); FDA v. Brown & Williamson Tobacco Corp. , 529 U.S. 120, 159-160, 120 S.Ct. 1291, 146 L.Ed.2d 121 (2000) (rendering as invalid regulations in which the FDA departed from statements it had made to Congress for over ninety years that it did not have jurisdiction over the tobacco industry, and ignoring that Congress had created a distinct regulatory scheme over the tobacco industry and expressly rejected proposals to give the FDA such jurisdiction). Here, in contrast, the DOL has acted within its delegated authority to regulate financial service providers in the retirement investment industry-which it has done since ERISA was enacted-and has utilized its broad exemption authority to create conditional exemptions on new investment-advice fiduciaries. That the DOL has extended its regulatory reach to cover more investment-advice fiduciaries and to impose additional conditions on conflicted transactions neither requires nor lends to the panel majority's conclusion that it has acted contrary to Congress's directive.
IV.
The panel majority's conclusion that the DOL exceeded its regulatory authority by *398 implementing the regulatory package that included a new definition of investment-advice fiduciary and both modified and created new exemptions to prohibited transactions is premised on an erroneous interpretation of the grant of authority given by Congress under ERISA and the Code. I would hold that the DOL acted well within its regulatory authority-as outlined by ERISA and the Code-in expanding the regulatory definition of investment-advice fiduciary to the limits contemplated by the statute, and would uphold the DOL's implementation of the new rules.

This is an important point. The DOL has noted that the "proposed general definition of investment advice was intentionally broad to avoid weaknesses of the 1975 regulation and to reflect the broad sweep of the statutory text." Fiduciary Rule, 81 Fed. Reg. 20,971. Realizing that "standing alone" the new definition "could sweep in some relationships that are not appropriately regarded as fiduciary in nature" and that the DOL did "not believe Congress intended to cover as fiduciary relationships," the DOL created "carve-outs" to exclude specific activities and communications from the definition of fiduciary investment advice. Fiduciary Rule, 81 Fed. Reg. 20,948 -49. After receiving comments on that proposal, the DOL eliminated the term "carve-out" from the final regulation and articulated with greater specificity the nature of communications and activities that would be regarded as fiduciary-creating "recommendations" while expressly proscribing conduct and relationships that ERISA was not enacted to prevent. See Fiduciary Rule, 81 Fed. Reg. 20,949 ; 29 C.F.R. § 2510.3-21(b)-(c).

Given the primary basis of the panel majority's holding, their opinion does not address Appellants' First Amendment claims. Because I would uphold the DOL's regulations, I would also reject Appellants' First Amendment claims as either waived or otherwise without merit.

The panel majority repudiates the use of dictionary definitions based on the Supreme Court's preference for common law understandings under ERISA in Varity Corp. v. Howe , 516 U.S. 489, 116 S.Ct. 1065 (1996). There, the Supreme Court was analyzing whether an employer's actions fell within the statutory definition of fiduciary, and specifically whether the employer was acting as a plan "administrator" at the time it rendered fraudulent advice related to its employees' retirement plans. Varity Corp. , 516 U.S. at 492-95, 116 S.Ct. 1065. Because the terms "fiduciary" and specifically trust "administration" were given a legal meaning under the common law, the Court proceeded to assess the employer's actions using standards set under common law trust principles related to plan administration. Id . at 502, 116 S.Ct. 1065. Here, because the common law does not directly inform what constitutes an "investment-advice fiduciary" under ERISA, the DOL's reliance on dictionary definitions to interpret the term is not inconsistent with or contrary to Varity Corp .

Accepting as true that the statutory definition of "investment-advice fiduciary" continues to be informed by the common law, I am not persuaded that the DOL's interpretation conflicts with common law trust principles. Throughout the new regulation, the DOL emphasizes that "ERISA safeguards plan participants by imposing trust law standards of care and undivided loyalty on plan fiduciaries," Fiduciary Rule, 81 Fed. Reg. 20946, and proscribed certain communications from the new definition of investment-advice fiduciary to "avoid[ ] burdening activities that do not implicate relationships of trust." Fiduciary Rule, 81 Fed. Reg. 20,950. Additionally, the DOL found that "[i]n the retail IRA marketplace, growing consumer demand for personalized advice ... has pushed brokers to offer comprehensive guidance services rather than just transactional support." Fiduciary Rule, 81 Fed. Reg. at 20,949 (emphasis added). These references to common law trust principles indicate the DOL's intention to regulate only those relationships in which investors rely on the advice and recommendation of financial professionals when making decisions concerning their retirement plans. Nothing in the regulations explicitly conflict with that standard.

Throughout its opinion, the panel majority represents that the BIC Exemption was created to draw back an otherwise "overinclusive" regulatory definition of investment-advice fiduciary, and that without the BIC Exemption, the new definition could "sweep in some relationships that are not appropriately regarded as fiduciary in nature and that the Department does not believe Congress intended to cover as fiduciary relationships." See Maj. Opn. at p. 367 (quoting Fiduciary Rule, 81 Fed. Reg. 20,948 ); see also Maj. Opn. at 381-82. However, the quoted language upon which the panel majority's opinion relies does not cite the BIC Exemption as the regulatory provision intended to keep the new definition of investment-advice fiduciary in line with the statutory definition of the same, but to certain exclusions of communications between advisers and plan beneficiaries within the new regulatory definition of investment-advice fiduciary. Note 1, supra , describes how the regulatory definition of investment-advice fiduciary explicitly circumscribes those "relationships that are not appropriately regarded as fiduciary in nature." The BIC Exemption is not the source of this exclusion (which serves to specify who is and who is not an investment-advice fiduciary), but it is the new definition of investment-advice fiduciary itself that limits its own reach. Relatedly, it is illogical to cite the BIC Exemption as creating an external limit on the new definition of fiduciary, as the entire purpose of the exemption is to impose requirements on parties who fall within the new definition of fiduciary (and consequently fall outside the group of advisers who are excluded from the new definition).