*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters.  Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 21-CV-0543

DISTRICT OF COLUMBIA, APPELLANT,

V.

TERRIS, PRAVLIK & MILLIAN, LLP, APPELLEE.

Appeal from the Superior Court of the
District of Columbia
(2020-CA-003087-B)

(Hon. Heidi M. Pasichow, Motions Judge)

(Argued September 28, 2022                    Decided June 5, 2025)

*Caroline S. Van Zile*, Solicitor General, with whom *Karl A. Racine*, Attorney General for the District of Columbia at the time the brief was filed, *Loren L. AliKhan*, Solicitor General at the time the brief was filed, and *Ashwin P. Phatak*, Deputy Solicitor General, and *Richard S. Love*, Senior Assistant Attorney General were on the brief, for appellant.

*Todd A. Gluckman*, with whom *Kathleen L. Millian* and *Nicholas Soares* were on the brief, for appellee.

*Adina H. Rosenbaum*, with whom *Allison M. Zieve* was on the brief as *amici curiae* on behalf of D.C. Open Government Coalition, American Civil Liberties Union of the District of Columbia, D.C. Fiscal Policy Institute, Public Citizen, Reporters Committee for Freedom of the Press, and Washington, D.C. Professional Chapter of the Society of Professional Journalists.

*Daniel P. Golden*, with whom *Nicole L. Streeter* and *Wei Guo* were on the brief as *amicus curiae* on behalf of the Council of the District of Columbia.

Before BLACKBURNE-RIGSBY, *Chief Judge*, and BECKWITH and HOWARD, *Associate Judges*.

HOWARD, *Associate Judge*: "The generation that made the nation . . . committed itself to the principle that a democracy cannot function unless the people are permitted to know *what their government is up to*." *U.S. Dep't of Just. v. Reps. Comm. for Freedom of Press*, 489 U.S. 749, 772-73 (1989) (emphasis in original) (quoting *EPA v. Mink*, 410 U.S. 73, 80 (1973) (Douglas, J., dissenting)); *see also Detroit Free Press v. Ashcroft*, 303 F.3d 681, 683 (6th Cir. 2002) ("Democracies die behind closed doors."). That principle has informed decades of case law under the Federal Freedom of Information Act and informs our case law under the District of Columbia Freedom of Information Act (D.C. FOIA).

This case concerns the Mayor's disclosure and publication obligations under the D.C. FOIA, primarily with respect to agency budget-request documents. The Mayor appeals a Superior Court order compelling her to produce certain agency budget-request documents requested by plaintiff/appellee Terris, Pravlik & Millian, LLP (TPM), a public interest law firm, pursuant to D.C. Code § 2-532, and to post those (and other) documents online as required by D.C. Code § 2-536(b) (often

referred to as the "publication provision").[1]  On appeal, the Mayor argues that she is entitled to withhold the budget-request documents due to executive privilege afforded by the separation of powers doctrine.  She further argues that TPM lacked standing to seek enforcement of the publication provision; that the publication provision is not enforceable via a private right of action; and that, even if disclosure of the requested documents is required, the trial court exceeded its authority by requiring disclosure of prospective documents.

For the reasons that follow, we reject the Mayor's invocation of the executive privilege arising out of the separation of powers doctrine here, but refrain from considering whether to recognize executive privilege in other contexts.  We further conclude that the trial court did not err in ordering disclosure to TPM of the requested budget documents or in ordering online publication of those documents for fiscal years 2019 to the present.  However, we vacate and remand the portions of the order requiring publication of documents under section 2-536 that did not include the budget-request documents that TPM sought.

---

[1] We note that TPM named the District of Columbia as the defendant in its complaint, and the District of Columbia remains the named appellant on appeal. However, because the Mayor and amicus curiae the Council of the District of Columbia (the Council) have taken different positions in the Superior Court and in this appeal, we shall refer to the appellant as the Mayor.

## I. Factual and Procedural Background

TPM serves as counsel for the plaintiff class of preschool-aged children with disabilities in *D.L. v. District of Columbia*, No. 05-CV-1437 (RCL) (D.D.C.). In that capacity, TPM is charged with monitoring the District of Columbia's compliance with the injunction entered in that case, which requires the District to ensure that the plaintiff class members receive the special education and related services guaranteed to them under federal law and District of Columbia regulations.  To that end, TPM searched online for agency budget-request documents transmitted to the Mayor and her Chief Financial Officer (CFO) by the D.C. Public Schools (DCPS) and the Office of the State Superintendent of Education (OSSE).

Unable to find those documents online, TPM submitted a D.C. FOIA request on October 18, 2019, to the Executive Office of the Mayor.  It sought: "(1) actual copies—not summaries—of [DCPS's and OSSE's] budget requests for fiscal year 2019"; "(2) any similar documentation describing in detail the agencies' budget needs or requests for fiscal year 2019"; and "(3) information identifying corresponding totals from the final approved budget."   TPM expressed that it was specifically interested in "funding for special education oversight, policy development and compliance issues impacting 3-5-year-olds," and that it did "not object to the production being narrowed accordingly."  TPM also asserted that the

information it requested "should be accessible to the public" under D.C. Code § 2-536(a)(6A). In December 2019, TPM was provided with a copy of OSSE's final budget that the Mayor proposed to the Council of the District of Columbia for fiscal year 2019, but OSSE's FOIA officer refused to produce its draft submission to the Mayor because it was "deliberative" and thus "privileged." TPM appealed this decision to the Office of the Mayor.

After failed attempts to receive a response from the Office of the Mayor on the status of its appeal, TPM filed a complaint in the Superior Court seeking declaratory judgment and injunctive relief. TPM sought production of the "requested documents to TPM for fiscal year 2019 and all subsequent years until this case is resolved," and online publication of "all documents as required under D.C. Code §§ 2-536(a)(6A) and 2-536(b)." The Mayor moved to dismiss, TPM opposed, and the Council filed an amicus curiae memorandum in support of TPM. After the trial court denied the Mayor's motion to dismiss, TPM moved for summary judgment, and the Mayor filed a cross-motion for summary judgment. The Superior Court granted TPM's motion for summary judgment, ordering that the Mayor produce not only the specific budget-request documents requested by TPM but also a broader set of documents it asked to be published (the required documents pursuant

to D.C. Code § 2-536[2]).  The court stayed enforcement of its order pending resolution of the Mayor's appeal to this court.

## II.     Legal Background

### A.     D.C.'s Annual Budget Process

The District of Columbia Charter, D.C. Code §§ 1-204.01 to 1-204.115, enacted as part of the Home Rule Act, D.C. Code §§ 1-201.01 to 1-207.71, vests the executive power of the District of Columbia "in the Mayor who shall be the chief executive officer of the District government."  D.C. Code § 1-204.22.  The Charter directs the Mayor to "prepare and submit to the Council each year, and make available to the public, an annual budget for the District of Columbia."  D.C. Code § 1-204.42(a).

During the budget development process, "the Mayor solicits budget information, recommendations, and advice" from District of Columbia administrative agencies based on the Mayor's policy and program priorities for the

---

[2] This statutory section lists which "categories of information are specifically made public information, and do not require a written request for information . . ." including public salary information, administrative staff and manuals, decisions in adjudicated cases, and certain budgetary information "transmitt[ed] to the Office of Budget and Planning during budget development."  *See* D.C. Code § 2-536.

coming year. Each agency director then submits a proposed budget to the Mayor through the Office of Budget and Planning (OBP) in the Office of the Chief Financial Officer (OCFO). This begins what OBP describes as "an iterative process through which the Office of the Mayor, OCFO and District agencies deliberate and make changes to each agency's proposed submission." "The Mayor then uses the advice, recommendations, and information that she receives from all District agencies to create her annual budget proposal submission to the [] Council."[3]

Upon receipt of the Mayor's proposed budget, the Council holds budget hearings and may accept, reject, or modify any or all of the Mayor's recommendations. *See* D.C. Code § 1-204.46(a). Within seventy calendar days of receipt of the proposed budget, the Council adopts by act "the annual budget for the District of Columbia government." D.C. Code § 1-204.46(a).[4]

---

[3] The Mayor and OCFO must supplement the Mayor's budget proposal "by submitting to the Council simultaneously with the proposed budget submission[] '[a]ctual copies . . . of all agency budget enhancement requests' and '[a]ny similar documentation describing in detail agencies' budget needs or requests.'" D.C. Code § 47-318.05a.

[4] The Mayor "shall have power to disapprove any items or provisions, or both" of the budget adopted by the Council. D.C. Code § 1-204.04(f). Any such

## B.    The D.C. Freedom of Information Act

The D.C. FOIA governs the disclosure of District of Columbia government documents to the public. *See* D.C. Code §§ 2-531 to 2-540. Open records statutes like the D.C. FOIA facilitate "public scrutiny and an informed citizenry," which "are vital to the functioning of a democratic society." *Animal Legal Def. Fund v. U.S. Dep't of Agric.*, 935 F.3d 858, 861 (9th Cir. 2019) (internal quotation marks and citations omitted). Provisions of the D.C. FOIA must "be construed with the view toward expansion of public access and the minimization of costs and time delays to persons requesting information." *Fraternal Ord. of Police v. District of Columbia*, 79 A.3d 347, 354 (D.C. 2013). "Because many provisions of the D.C. FOIA mirror provisions in the federal Freedom of Information Act, we have found case law interpreting the federal FOIA to be 'instructive authority with respect to our own Act.'" *Id.* (quoting *Doe v. District of Columbia Metro. Police Dep't*, 948 A.2d 1210, 1220 (D.C. 2008)).

The statute contains three interrelated provisions that are relevant here: (1) D.C. Code § 2-534, describing categories of documents that are exempt from

disapproval by the Mayor can be overridden by the Council with a two-thirds vote. *Id.*

disclosure; (2) D.C. Code § 2-536(a), describing categories of information or documents that "are specifically made public and do not require a written request"; and (3) D.C. Code § 2-537(a)(2), authorizing a "person seeking disclosure [to] bring suit in the Superior Court . . . to enjoin the public body from withholding the record and to compel the production of the requested record." We provide background on the first two sections, reserving discussion on the third for our analysis below.

Section 2-534 renders several categories of documents exempt from disclosure, such as "[i]nter-agency or intra-agency memorandums or letters, including memorandums or letters generated or received by the staff or members of the Council, which would not be available by law to a party other than a public body in litigation with the public body." D.C. Code § 2-534(a)(4). This court has recognized that "[e]xplicitly encompassed by th[e] exemption [in § 2-534(a)(4)] are documents within the deliberative process privilege." *Fraternal Ord. of Police*, 79 A.3d at 354; *see also* D.C. Code § 2-534(e) ("The deliberative process privilege, the attorney work-product privilege, and the attorney-client privilege are incorporated under the inter-agency memoranda exemption listed in subsection (a)(4) of this section[.]").

Section 2-536(a) of the D.C. FOIA makes many types of information public information that "must be disclosed even in the absence of a written request." Fiscal

Year 2023 Budget Support Act of 2022, D.C. Council, Report on Bill 24-714 at 9

(May 10, 2022). In 2004, the Council added a new paragraph to make public

> Budget requests, submissions, and reports available electronically that agencies, boards, and commissions transmit to the Office of [ ] Budget and Planning during the budget development process, as well as reports on budget implementation and execution prepared by the Office of the Chief Financial Officer, including baseline budget submissions and appeals, financial status reports, and strategic plans and performance-based budget submissions[.]

D.C. Code § 2-536(a)(6A) (hereinafter, Paragraph 6A). The Council has written that

"[P]aragraph 6A has *always* required that the Mayor make these documents

public[.]" Report on Bill 24-714 at 9.

In 2022, the Council amended[5] the D.C. FOIA in response to this litigation

and what it called the Mayor's "consistently [failing] to make public" the documents

---

[5] The amendments added two relevant subsections to D.C. Code § 2-536. Subsection (d)(1) provides that "[n]otwithstanding any other provision of law, no document or information described in [Paragraph 6A] of this section that was created on or after December 7, 2004, shall be exempt from disclosure pursuant to [§ 2-]204(a)(4) and (e)." Subsection (d)(2) provides that

> "[i]n addition to making such document or information public information pursuant to subsection (a) of this section, a public body shall provide any document or

under Paragraph 6A. *Id.* As the Mayor acknowledged in her supplemental brief, these amendments rendered the deliberative process privilege inapplicable to the agency budget-request documents described in Paragraph 6A (and that TPM sought through its D.C. FOIA request focused on OSSE and DCPS).

## III. Standard of Review

"We review a grant of summary judgment de novo." *Wong v. District of Columbia*, 314 A.3d 1236, 1240-41 (D.C. 2024); *see also Fraternal Ord. of Police*, 79 A.3d at 353 (stating same). "The grant or denial of injunctive relief is discretionary with the trial court and will be reversed on appeal only when that discretion has been abused." *Albergottie v. James*, 470 A.2d 266, 270 (D.C. 1983).

---

information described in [Paragraph 6A] of this section that was created on or after December 7, 2004, to a person who has requested to inspect or copy it pursuant to [D.C. Code § 2-202], regardless of the date on which such request may have been made."

Agency Budget Request Freedom of Information Clarification Amendment Act of 2022, § 1042(b), D.C. Law 24-167, 69 D.C. Reg. 9223, 9229 (July 29, 2022).

## IV.    Analysis

We first discuss the Mayor's separation of powers arguments, which relate to both TPM's request for documents and its request for online publication of "all documents as required under D.C. Code § 2-536(a)(6A) and 2-536(b)," followed by the Mayor's arguments specific to the latter request.

### A.    Whether the Separation of Powers Doctrine Exempts the Agency Budget-Request Documents from Disclosure

As a result of the 2022 amendment, the Mayor no longer contends that "the text of D.C. FOIA requires neither production nor publication of the agency preliminary budget documents at issue in this case." The Mayor, however, continues to assert that the budget-request documents at issue are "protected by the executive communications privilege inherent in the constitutional separation of powers." We disagree and conclude that no such privilege or exemption from disclosure applies to the documents involved in this case. To explain, we (1) review how courts have evaluated when executive privilege implicates separation of powers concerns, before turning to (2) whether the Mayor has exclusive authority over the budget and (3) whether Paragraph 6A otherwise interferes with the Mayor's functions in ways that implicate separation of powers concerns.

### 1.     Applicable Separation of Powers Principles

The executive privilege at issue here derives from separation of powers principles. "This court has long acknowledged that the separation-of-powers principles 'as are applicable to the three branches of government at the federal level' likewise 'govern the exercise of [each branch's powers] in the District Charter.'" *Fraternal Ord. of Police Metro. Police Dep't Lab. Comm. v. District of Columbia*, 290 A.3d 29, 41 (D.C. 2023) (alteration in original) (quoting *Wilson v. Kelly*, 615 A.2d 229, 231 (D.C. 1992)) (internal brackets omitted).  Because the three branches of government have "a degree of overlapping responsibility," "[t]he separation of powers is not implicated where one branch of government merely exercises power in an area in which there is an overlap of responsibility." *Id.* (quoting *Mistretta v. United States*, 488 U.S. 361, 381 (1989)).  Rather, a party alleging a separation of powers violation has a "difficult burden" to show that an action results in "the *whole* power of one department being exercised by the same hands which possess the *whole* power of another department." *Id.* (quoting *Mistretta*, 488 U.S. at 380-81 (alteration in original) (quoting THE FEDERALIST NO. 47, at 325-26 (James Madison) (J. Cooke ed., 1961))); *see also District of Columbia v. Fitzgerald*, 953 A.2d 288, 292 (D.C. 2008) (quoting same), *opinion amended on denial of reh'g*, 964 A.2d 1281 (D.C. 2009).

At the federal level, the "supremacy of the Executive Branch within its assigned area of constitutional responsibilities," then, leads to an "implied executive privilege." *Trump v. Thompson*, 20 F.4th 10, 26 (D.C. Cir. 2021) (quoting *Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 447 (1977)). "That privilege allows a President to protect from disclosure 'documents or other materials that reflect presidential [decision making] and deliberations and that the President believes should remain confidential.'" *Id.* at 25 (quoting *In re Sealed Case*, 121 F.3d 729, 744 (D.C. Cir. 1997)). "Because 'a President and those who assist him must be free to explore alternatives in the process of shaping polices and making decisions and to do so in a way many would be unwilling to express except privately,' the privilege 'safeguards the public interest in candid, confidential deliberations within the Executive Branch.'" *Thompson*, 20 F.4th at 26 (quoting *United States v. Nixon*, 418 U.S. 683, 708 (1974); *Trump v. Mazars USA, LLP*, 591 U.S. 848, 864 (2020)).

As the Mayor points out, a number of jurisdictions have recognized a similar executive communications privilege as to their local executive. *See, e.g.*, *Killington, Ltd. v. Lash*, 572 A.2d 1368, 1373 (Vt. 1990) ("Federal and state courts have accorded to the chief executive of the nation or of a state a privilege which is 'fundamental to the operation of Government and inextricably rooted in the separation of powers.'") (quoting *Nixon*, 418 U.S. at 707), *overruled on other grounds by Energy Pol'y Advoc. v. Att'y Gen.'s Off.*, 308 A.3d 456 (Vt. 2023); *Guy*

*v. Jud. Nominating Comm'n*, 659 A.2d 777, 783 (Del. Super. Ct. 1995) (observing that state courts considering the existence of an executive privilege "have been nearly unanimous in holding that a governor, in the discharge of official duties, is entitled to an executive privilege to protect the governor's deliberative and mental processes"). While an executive communications privilege is "inextricably rooted in the separation of powers under the Constitution," *Nixon*, 418 U.S. at 708, it is "not mentioned in the text of the Constitution," and is "qualified," not "absolute." *Thompson*, 20 F.4th at 26.

We have not, however, had occasion to decide whether the Mayor enjoys an executive communications privilege and, if so, what the scope of that privilege may be. We need not decide either question in this case, where we disagree with the Mayor about the two separation of powers concerns that she raises.[6]

---

[6] In declining to discuss the scope of an executive communications privilege, we make no holding as to the trial court's conclusion that the Mayor failed to meet her burden to show that the privilege could apply to agencies outside the Office of the Mayor involved in the budgetary process. *See Citizens for Resp. & Ethics in Wash. v. U.S. Dep't of Homeland Sec.*, 592 F. Supp. 2d 111, 118 (D.D.C. 2009) (holding that the executive communications privilege should "apply only to communications authored or solicited and received by those members of an immediate White House adviser's staff who have broad and significant responsibility for investigating and formulating the advice to be given the President" because only those communications are "close enough to the President . . . to pose a risk to the candor of his advis[o]rs.").

### 2. Whether the Mayor Has Exclusive Authority Over the Budget

The Mayor argues that "the Mayor's duty under the Charter to prepare and submit an annual budget to the Council is explicit and exclusive," but we disagree. As this court has said, "[t]he separation of powers is not implicated where one branch of government merely exercises power in an area in which there is an overlap of responsibility." *Fraternal Ord. of Police Metro. Police Dep't Lab. Comm.*, 290 A.3d at 41 (internal quotation marks and brackets omitted). The D.C. Charter provisions establishing the District's budgetary process create such an overlap. As described above, the Mayor must present a proposed budget to the Council, and the Council must act within seventy calendar days of its receipt. D.C. Code § 1-204.46(a). Following initial presentation of the budget, the Mayor can make further modifications, subject to the Council's two-thirds vote override. D.C. Code § 1-204.04(f). These provisions of the D.C. Charter make clear that the budget is not an exclusive function of either the executive or the legislative branch. Rather, the procedural back-and-forth in these provisions shows that authority over the budgetary process is vested in both the Mayor and the Council. The Mayor initiates the budgetary process but, as we have stated, it is "the Council, not the Mayor, [that has] ultimate authority (subject to congressional review) over the District's annual budget." *Convention Ctr. Referendum Comm. v. D.C. Bd. of Elections & Ethics*, 441

A.2d 889, 906 n.31 (D.C. 1981). Unlike federal FOIA cases that have allowed withholding of documents under executive privilege because those documents have concerned powers within the exclusive purview of the Executive Branch, the Mayor does not have an exclusive function here that Paragraph 6A could implicate. *See, e.g.*, *Loving v. Dep't of Def.*, 550 F.3d 32, 38-40 (D.C. Cir. 2008) (holding that executive privilege covered recommendations from Army and Defense Secretaries and Judge Advocate General to President advising him in his statutorily required review of Army private's death sentence because the recommendations "'directly involve[d]' the President and their confidentiality 'ensure[s] that presidential decision-making is of the highest caliber, informed by honest advice and full knowledge.'" (quoting *In re Sealed Case*, 121 F.3d at 750) (alterations in original).

### 3. Whether Paragraph 6A Interferes with the Mayor's Functions

The Mayor further argues that forcing her to reveal her preliminary budget documents pursuant to Paragraph 6A interferes with her executive functions. Specifically, she contends, it impinges on her prerogative, as the Mayor, to "fire the opening [budget] shot" that will have an "anchoring effect" on the budget process, limiting her in submitting the annual budget of her choosing. For the reasons that follow, we disagree that Paragraph 6A impermissibly limits the Mayor.

Under the separation of powers doctrine, the "encroachment or aggrandizement of one branch of government at the expense of the other . . . does not occur where, under a particular measure, the responsibility conferred on a branch of government by [the legislature] is left essentially intact." *Fraternal Ord. of Police Metro. Police Dep't Lab. Comm.*, 290 A.3d at 41 (internal quotation marks, citations, and brackets omitted); *see, e.g.*, *id.* at 41-42 (dismissing suit against Council legislation that removed some mayoral discretion over releases of police body-worn camera footage since legislation did not remove "*all* of the Mayor's *discretion and power* over the release of BWC footage and the identities of officers.") (emphasis in original); *Hessey v. Burden*, 584 A.2d 1, 6 (D.C. 1990) (upholding creation by ballot initiative of an Office of Public Advocate for Assessments and Taxation since establishment of office would not "impermissibly burden[]" or "unduly interfere[] with" the Mayor's responsibility for tax assessments).

Here, we do not see how the Mayor's responsibility to develop and submit a budget is encroached upon by requiring the Mayor to disclose initial agency budget-submission documents. First, that budgetary responsibility appears limited by the Home Rule Act. As the Council points out in its amicus brief, the D.C. Charter requires the Mayor's proposed budget to include an analysis that "consider[s] the cost and benefits of alternatives and the rationale behind action recommended or adopted[.]" D.C. Code § 1-204.42(a)(6). By requiring this analysis, the language

itself seems to require the Mayor to shed light on agencies' budget recommendations, the merits of those recommendations, and the rationales behind adopting or not adopting those recommendations. (It also seems like that light would reach to the types of documents Paragraph 6A requires, like "reports on budget implementation and execution prepared by the Office of the Chief Financial Officer, including baseline budget submissions and appeals, financial status reports, and strategic plans and performance-based budget submissions[.]").

Second, we do not see how those disclosures stop the Mayor from being free "to submit to the Council the annual budget of her choosing." Agency directors submit their proposed budgets "based on the Mayor's directions." Even with the disclosures that Paragraph 6A requires, the Mayor remains free to set those initial parameters and free to reject or modify the agencies' budget recommendations to promote her policy priorities through the budget she submits to the Council. Paragraph 6A thus does not "impermissibly burden or unduly interfere with" the Mayor's exercise of her executive-branch responsibilities.[7] *Fraternal Ord. of Police Metro. Police Dep't Lab. Comm.*, 290 A.3d at 36.

---

[7] The Mayor analogizes her argument to the reasoning set forth in a 1982 federal Office of Legal Counsel (OLC) opinion mentioned during oral argument.

The Mayor concedes that the 2022 D.C. FOIA amendment means that the budget information described in Paragraph 6A is "no longer exempt from DC FOIA's disclosure requirement under the deliberative process privilege," but we take the Mayor to still press her remaining arguments that an executive communications privilege applies. One of the Mayor's arguments is that "knowledge that subordinates' assessments and recommendations [can] be disclosed in the future . . . [would] chill[] an executive's ability to obtain candid assessments and recommendations." As an initial matter, the Mayor does not explain how this

---

That opinion reasons that since separation of powers requires the president to have ultimate control over subordinate officials, including the right to supervise and review their work, disclosure of "unreviewed [agency] recommendations" "would disrupt the normal . . . decision-making process and interfere with the President's ability to supervise[.]" 6 Op. O.L.C. 632, 640 (1982). The opinion concludes that such disruption should be permitted *only* where there is a "specific or compelling congressional need for the information[.]" *Id.* at 632. It further concludes that Congress's desire to "obtain more information to assist it in carrying out its review of the budget" is *not* such a specific or compelling need. *Id.* at 641-42.

We find the analogy unpersuasive. The federal budget process, as described at 31 U.S.C. § 1105, does not have a similar provision to the D.C. Charter provision requiring the Mayor to disclose "the cost and benefits of alternatives and the rationale behind [the particular] action recommended." D.C. Code § 1-204.42(a)(6)—a requirement that seems to necessarily entail disclosure of non-adopted proposals. We are also skeptical of the OLC opinion's conclusion that the Council, in exercising its ultimate authority over the District's budget, has no compelling need to know agency directors' assessments of the budget needs of their agencies.

chilling effect would interfere with her budgetary duties. After all, the documents are not authored by her close advisors, but rather by District agencies and OCFO. *See* D.C. Code § 2-536(a)(6A) (including "[b]udget requests, submissions, and reports . . . that *agencies, boards, and commissions* transmit [to OBP] . . . , as well as reports on budget implementation and execution prepared by the Office of the Chief Financial Officer[.]" (emphasis added)); *Loving*, 550 F.3d at 38-40 (concluding that documents prepared by close advisors to facilitate a responsibility in the executive's purview are covered by the executive communication privilege).

Nor do we perceive such a chilling effect based on this record. OBP Director Jennifer Reed stated "[e]ach year in September or October, the Mayor solicits budget information, recommendations, and advice from her agencies for the upcoming fiscal year." Based on the information provided by Ms. Reed, TPM's October 2019 request came, as the trial court reasoned, "a full year after the initial solicitation for information and at least six months after the Mayor submits her budget proposal to the Council." We agree with the trial court that a request for budget information "made *after* budget deliberations occurred, and not *during* the Mayor's discussions with agency leaders and the CFO, and subsequent submission to the Council, does not interfere with the Mayor's . . . ability to obtain candid and informed opinions from her advisors [in real time]."

This conclusion makes particular sense when we consider that, despite the Mayor's use of the word "preliminary," the budget-request documents at issue were not internal, pre-submission-to-the-Mayor agency communications or drafts. The parties appear to agree that TPM's requested budget documents are, as described in the declaration of Eric M. Cannady, the Deputy Chief Financial Officer for OBP, "documents that are transmitted to the OCFO in the earliest stages of the budget process and include financial requests, along with the underlying policy recommendations and rationales from senior agency officials." In other words, the requested documents are "initial" budget-request documents that are officially transmitted beyond the executive, but not documents that reflect the "iterative process"[8] involving back-and-forth with OCFO and the Mayor, which occurs after.

---

[8] As Ms. Reed explained,

> Around November, each Agency Director submits a proposed budget based on the Mayor's directions, working closely with the agency fiscal officers from the Office of the Chief Financial Officer (OCFO), which includes financial information, as well as budget advice and recommendations. This is the beginning of an iterative process through which the Office of the Mayor, Office of the Chief Financial Officer and District agencies deliberate and make changes to each agency's proposed submission. The budget proposals go through several

For that and the foregoing reasons, we reject the Mayor's separation of powers argument as to the facts of this case. And we thus decline to address the applicability of the executive privilege doctrine more broadly.

## B.   Whether TPM Can Seek to Enforce Sections 2-536(a) and (b)

We turn now to the Mayor's arguments that relate to TPM's request for "all documents as required under D.C. Code § 2-536(a)(6A) and 2-536(b)." We first consider the Mayor's argument that TPM lacked standing to sue for documents that were not part of its original D.C. FOIA request. We then turn to the Mayor's arguments that even if TPM had standing, the Superior Court exceeded its authority in ordering the Mayor to make a disclosure beyond that requested by TPM in its D.C. FOIA request.

### 1.   Whether TPM Has Standing

The Mayor argues that "TPM's standing to obtain directly the OSSE and DCPS budget documents it specifically requested does not confer standing to obtain

> rounds of discussion and vetting during the deliberation process. As new information becomes available, it can change the outcomes of final decisions and final costs. Moreover, during this process, policy decisions are adjusted and changed based on the latest information, policy priorities and discussion.

prospective publication of all documents listed in D.C. Code § 2-536."[9]  Because courts considering FOIA cases have "never suggested that those requesting information . . . need show more than that they sought and were denied specific agency records," we disagree.  *Pub. Citizen v. U.S. Dep't of Just.*, 491 U.S. 440, 449 (1989).

"Even though Congress created the District of Columbia court system under Article I of the Constitution, rather than Article III, this court has followed consistently the constitutional standing requirement embodied in Article III." *Moeller v. District of Columbia*, 253 A.3d 165, 168 (D.C. 2021) (quoting *Grayson v. AT&T Corp.*, 15 A.3d 219, 224 (D.C. 2011) (en banc)).  "[T]o satisfy the requirements for constitutional standing, a plaintiff must allege facts demonstrating: (1) an injury in fact, meaning an invasion of a legally protected interest that is (a) concrete and particularized and (b) actual or imminent; (2) a causal connection between the injury and the conduct complained of; and (3) a likelihood that the injury will be redressed by a favorable decision."  *Kalorama Citizens Ass'n v.*

---

[9] Our discussion does not address TPM's standing to obtain the DCPS and OSSE documents it specifically requested because it is well-established that when an agency denies a FOIA request, the requestor has standing to sue.  *See, e.g.*, *Grayson v. AT&T Corp.*, 15 A.3d 219, 231 n.24 (D.C. 2011) (en banc) ("A FOIA plaintiff's standing does not turn on whether the Act, as correctly construed, ultimately requires the government to disclose the agency records being sought.").

*SunTrust Bank Co.*, 286 A.3d 525, 532 (D.C. 2022) (internal quotation marks, citations, and brackets omitted). We address the injury in fact requirements as they relate to denial-of-information cases like this one before discussing how those requirements, along with traceability and redressability, apply here to TPM.

The injury in fact requirements may be met when a plaintiff alleges either a procedural or informational injury. As the Supreme Court has explained, "the violation of a procedural right granted by statute can be sufficient in some circumstances to constitute injury in fact," such that a plaintiff may not need to "allege any additional harm beyond the one Congress has identified." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 342 (2016); *see also Fed. Election Comm'n v. Akins*, 524 U.S. 11, 21 (1998) (holding that a group of voters' "inability to obtain information" under statute formed concrete and particular injury); *Pub. Citizen*, 491 U.S. at 449 (holding that two advocacy organizations' failure to obtain information subject to disclosure under the Federal Advisory Committee Act "constitutes a sufficiently distinct injury to provide standing to sue").

"A plaintiff sustains a cognizable informational injury in fact when agency action cuts [them] off from 'information which must be publicly disclosed pursuant to a statute.'" *Animal Legal Def. Fund*, 935 F.3d at 867 (quoting *Akins*, 524 U.S. at 21); *see, e.g.*, *N.Y. Legal Assistance Grp. v. Bd. of Immigr. Appeals*, 987 F.3d 207,

216 n.18 (2nd Cir. 2021) (*NYLAG*) ("[NYLAG] alleges that the agency's failure to make unpublished [Board of Immigration Appeals] decisions publicly available . . . impairs NYLAG's ability to represent clients in immigration proceedings. This type of injury has been found to satisfy the constitutional requirements of standing.") (internal quotations and citations omitted); *see also Waterkeeper All. v. Env't Prot. Agency*, 853 F.3d 527, 533 (D.C. Cir. 2017) (concluding that when an agency's action "reduces the information that must be publicly disclosed" and means people who "sought that information no longer have a statutory right to access it," "[f]or the purpose of standing, that's injury enough").

A cognizable informational injury exists even "absent the denial of a request for particular information." *Animal Legal Def. Fund*, 935 F.3d at 867. In *Animal Legal Defense Fund v. U.S. Department of Agriculture*, the Ninth Circuit concluded that animal rights groups suffered an injury in fact when an agency changed its policies and declined to post records related to enforcement activities under the Animal Welfare Act. 935 F.3d at 863-64, 868-69. Despite an applicable provision of the federal FOIA that requires agencies to "post certain categories of documents *without a request*," the plaintiffs had not been able to obtain records from the agency's online reading room—affecting the plaintiffs' abilities to identify areas of animal welfare concern. *Id.* at 865, 867 (emphasis in original). The Ninth Circuit declined to decide whether a "bare statutory violation" could cause a "cognizable

injury in fact" since the plaintiffs had suffered "real[,] as opposed to purely legal" harms. *Id.* at 867. These included allegations that plaintiff organization members lacked information to "inform their daily lives, (such as whether they are about to purchase a pet from a puppy mill known for abuses)," the time and cost of submitting FOIA requests, and the staleness of information that can occur after waiting for an agency to produce records. *Id.* "Their inability to inspect documents in virtual reading rooms harmed them in real-world ways[,]" and the harm was "fairly traceable" to the agency's decision not to produce records and likely to be redressed through the requested relief. *Id.* at 869. Moreover, given that Congress designed the applicable provision "to reduce the need for individual requests . . . [y]et the change of policy has required Plaintiffs to make requests for copies of the records previously publicly available," the court concluded that the plaintiffs had suffered "the kind of harm Congress sought to prevent." *Id.* at 868.

Like the plaintiffs in *Animal Legal Defense Fund*, TPM has also asserted real harms that flow from the harm caused by the Mayor's withholding of information that had to be disclosed under Section 2-536. TPM's counsel explained at oral argument that TPM needs to know, for each fiscal year, what funding OSSE and DCPS believe they need in order to comply with the *D.L.* injunction, and it is apparent to us that the Mayor's failure to disclose documents required under section 2-536 hindered TPM's efforts. To be sure, the Mayor contends that when it

comes to "all documents listed in D.C. Code § 2-536," TPM "has articulated no concrete injury from the absence of . . . publication" and has asserted only an "abstract and generally available grievance." But TPM has pointed to its series of failed attempts to find and retrieve documents needed to monitor the District's compliance with the injunction issued in *D.L.* Especially for a plaintiff like TPM, which is charged with monitoring an agency's compliance efforts, making documents freely available online in compliance with law and without a request is plausibly necessary to avoid delayed and more burdensome access to records. And just as the Ninth Circuit found an injury where a plaintiff had to make requests for documents under a FOIA provision "specifically designed to reduce the need for individual requests," 935 F.3d at 868, we conclude that section 2-536 was similarly designed to reduce requests—and that TPM has suffered the type of harm the Council meant to prevent. Finally, we agree with TPM that since standing hinges "on the claims and form of the relief sought in the Complaint, not the scope of the relief awarded," the trial court's award of broader relief than what TPM sought in its initial D.C. FOIA request does not now impact its standing.

In short, TPM suffered an actual injury. That injury, along with the undisputed traceability of that injury to the actions the Mayor took in withholding that information and the likelihood of the injury being redressed with the disclosure of information required under sections 2-536(a) and (b), gave TPM standing to

challenge the decision of the Mayor not to produce documents required under sections 2-536(a) and (b).

### 2. Whether the Superior Court Exceeded Its Authority in Requiring Disclosure Under Section 2-536

Next, the Mayor contends that while the D.C. FOIA statutory scheme "provides a remedy if the District fails to provide documents to an individual requester, it does not authorize a private party to sue to force, let alone authorize the court to order, the publication of documents online pursuant to D.C. Code § 2-536." We disagree and hold that under the D.C. FOIA, a party may seek injunctive relief to order the publication of documents online.

A requester who is "denied the right to inspect a public record" and has exhausted administrative remedies may file suit for declaratory or injunctive relief in Superior Court. D.C. Code §§ 2-537(a)(1), (2). In "any suit" filed by a person denied the right to inspect a public record, "the Superior Court for the District of Columbia may *enjoin the public body from withholding records* and order the production of any records improperly withheld from the person seeking disclosure." D.C. Code § 2-537(b) (emphasis added). The Mayor reads these provisions to contend that while a court may "order production of improperly withheld documents

to an individual requester, there is no similar provision that authorizes it to require documents to be published on the internet."

Courts considering similar language to ours in the federal FOIA, however, have "interpret[ed] the words 'to enjoin the agency from withholding agency records' to mean what they say: FOIA authorizes district courts to stop the agency from holding back records it has a duty to make available, which includes requiring an agency to post [those] documents online." *Animal Legal Def. Fund*, 935 F.3d at 869 (quoting 5 U.S.C. § 552(a)(4)(B)). That authorization particularly matters where there has been a "repeated failure to disclose documents" and a "need to pursue successive . . . successful challenges every time it sought such documents[.]" *Citizens for Resp. & Ethics in Wash. v. U.S. Dep't of Just.*, 846 F.3d 1235, 1242 (D.C. Cir. 2017) (internal quotation marks omitted) (*CREW*). To be sure, federal circuits have differed on the scope of that authorization. As the Mayor correctly points out, the D.C. Circuit has held that under the federal FOIA's "reading room provision," which requires federal agencies to make certain agency records "available for public inspection in an electronic format," 5 U.S.C. § 552(a)(2), district courts "lack authority under FOIA to order agencies to make [records] available for public inspection," *CREW*, 846 F.3d at 1246 (internal quotation marks omitted). But that holding, which involved a public interest group's attempt to force OLC to make available for public inspection certain documents and indexes, was

governed by an earlier D.C. Circuit case that seemed to limit the scope of § 552(a)(4)(B). *See id.* at 1243 (discussing the holding that, "it might seem strange" for Congress to require agencies to publish without giving courts power to order publication, but § 552 only allows a district court to order "production of any agency records improperly withheld *from the complainant*[,]" in *Kennecott Utah Copper Corp. v. U.S. Dep't of Interior*, 88 F.3d 1191, 1202 (D.C. Cir. 1996) (emphasis in original)); *see also Animal Legal Def. Fund*, 935 F.3d at 875-76 (discussing history). But we are not bound by that precedent and decline to adopt such a holding because D.C. FOIA declares that "*all persons* are entitled to full and complete information regarding the affairs of government. . ." and requires that the "provisions of this subchapter shall be construed with the view toward expansion of public access and the minimization of costs and time delays to persons requesting information." D.C. Code § 2-531.

We find more persuasive the Ninth Circuit's analysis of the shared language between D.C. Code § 2-537 and 5 U.S.C. § 552. It declined to render the "provision into precatory language, despite § 552(a)(2) imposing a mandatory duty for agencies to make certain records 'available for public inspection' and § 552(a)(4)(B) granting 'jurisdiction to enjoin the agency from withholding agency records.'" *Animal Legal Def. Fund*, 935 F.3d at 875. Contrary to the D.C. Circuit, the Ninth Circuit held that district courts can "compel an agency to make documents available to the general

public" as injunctive relief sought by FOIA plaintiffs. *See id.* at 865. That court focused its analysis on the text and structure of § 552(a)(4)(B), reasoning that "[i]f . . . Congress only authorized federal courts to 'order the production' of records to a particular complainant, then the judicial-review provision would not need the words 'jurisdiction to enjoin the agency from withholding agency records[,]' because the ["order the production"] phrase would do all of the necessary work." *Id.* at 870. Thus, that court rejected an interpretation under which, "if an agency shrugs th[e] congressional command [to post a certain record], the statute forces plaintiffs right back into the requests and backlogs Congress sought to avoid in the first place." *Id.* at 872.

The Second Circuit reached the same conclusion in *NYLAG*. 987 F.3d at 207. It held that a district court had authority under the federal FOIA to order the Board of Immigration Appeals to make its unpublished decisions available to the public—not just the requester. *Id.* The Second Circuit reasoned that Congress's use of the word "and" in § 552(a)(4)(B) "suggest[s] that Congress meant to authorize courts to exercise two independent powers [(1) enjoining the withholding of records and (2) compelling the production of records], only the second of which would be modified by the ["improperly withheld from the complainant"] phrase[.]" *Id.* at 215-16. The context of § 552(a)(4)(B) also mattered "given that both parties agree that Congress intended courts to review agencies' compliance with the affirmative

obligations in § 552(a)(2)." *Id.* at 221. The Second Circuit concluded that, "it makes little sense to suggest that the remedy for failing to comply with those obligations is limited to the one embodied in the provision itself, which operates outside the scope of that judicial review." *Id.* And that court declined to adopt an interpretation that would "have such records be made available only to those individual members of the public who have the resources to seek them out" because that would be "antithetical" to Congress's goals of disclosure. *Id.* at 224 & n.27.

We decline to adopt a similarly antithetical interpretation when it comes to the D.C. FOIA. For starters, we have observed that the D.C. FOIA declares "the public policy of the District of Columbia" to be "that all persons are entitled to full and complete information regarding the affairs of government and the official acts of those who represent them." *Fraternal Ord. of Police*, 79 A.3d at 353-54 (quoting D.C. Code § 2-531). In light of that public policy and mandate, we think the better reading is to construe section 2-537(a) as authorizing a Superior Court judge, at the request of an individual complainant that satisfies the requirements of standing, to enjoin public agencies from holding back records that they have a duty to make available to the public without request under section 2-536. To conclude otherwise would "render the proactive disclosure requirements" of section 2-536 to be "merely precatory." *NYLAG*, 987 F.3d at 220. Thus, we conclude that the trial court did not exceed its authority in requiring the Mayor not only to produce the OSSE and DCPS

budget-request documents TPM sought, but also to post those documents online as required by Section 2-536(b).

### 3.     Whether the Superior Court Erroneously Granted "Prospective Relief"

The last question we address is whether the Superior Court erred in granting TPM—as the Mayor puts it—"prospective relief" for "documents not yet in existence." *Humane Soc'y of the U.S. v. U.S. Fish & Wildlife Serv.*, 838 F.App'x 721, 731 (4th Cir. 2020). We think the Mayor's claim mischaracterizes the nature of the trial court's order, but we remand for the trial court to specify what relief is due here under Section 2-536.

Of course, courts fashioning relief must "take into account the potentially significant burden on the agency of complying with any such order, and work with the parties to establish realistic timelines for compliance." *NYLAG*, 987 F.3d at 225. But courts may grant—and, in the federal context, have granted—injunctive relief that comes with an affirmative duty to disclose. *Compare id.* (declining to require agency to produce twenty-five years' worth of immigration decisions, but suggesting that "requiring compliance going forward" or posting a "smaller subset of unpublished decisions" could "provide complete relief"), *and CREW*, 846 F.3d at 1242 ("Following *Renegotiation Board*, *Payne*, and [other D.C. Circuit] decisions,

we have little trouble concluding that a district court possesses authority to grant the first two categories of relief CREW seeks—a prospective injunction with an affirmative duty to disclose."), *with Humane Soc'y*, 838 F.App'x at 726, 731 (affirming dismissal of a FOIA action that sought an injunction to make agency records "available on an ongoing basis electronically . . . after the receipt or creation of such records" because records were "*not yet in existence*").  We adopt that reasoning because, namely, we "cannot square our precedents with the agency's position that courts have no authority beyond ordering the agency to produce a copy of a requested document to the requester."  *Animal Legal Def. Fund*, 935 F.3d at 874.

Here, as an initial matter, the trial court does not appear to have ordered the publication of "prospective" documents, but does appear to have found that the Mayor had not produced documents under Section 2-536(a)(6A).  After TPM's complaint sought the publication of documents that the Mayor was statutorily required to produce, the trial court concluded in its summary judgment order that "[t]he documents that the District states are predecisional and deliberative are listed in [Section 2-536(a)(6A)] as documents that need to be produced and published."  The trial court then ordered:

> As the Court grants TPM's Motion for Summary
> Judgment in its entirety but denies the District's Motion

> for Summary Judgment, the District has fourteen (14) days from the instant Order, on or before August 5, 2021, to produce the documents requested [sic] TPM's FOIA request *and to comply with D.C. Code § 2-536(a)(6A). . . .* it is this 20[th] day of August 2021, hereby, . . . FURTHER ORDERED that the Defendant SHALL PUBLISH *the required documents pursuant to D.C. § 2-536* on or before August 5, 2021.

(Emphasis added). After summary judgment and upon a consent motion from both parties, the court clarified that the order:

> means exactly as it is written. D.C. Code § 2-536 specifically enumerates certain documents that the D.C. Council required the government to publish not just the 2019 documents that the Plaintiff's requested. Thus, the Court . . . clarifies the July 23, 2021 Order in that the District was required [sic] publish the documents pursuant to § 2-536 which necessarily encompasses the documents requested by the Plaintiff.

In short, as a form of equitable relief, the trial court ordered the publication of documents under section 2-536.

We cannot tell from the trial court's order, however, what is covered by the required publication of "documents pursuant to § 2-536." Read a number of different ways, the trial court's order could include budget requests, submissions, and reports just for 2019; for 2019 and all fiscal years after this litigation commenced; for all provisions under section 2-536 or just sections 2-536(a)(6A) and 2-536(b), as TPM sought; or, as the Mayor frames it, "prospective" documents

moving forward. So we remand for clarification on the scope of relief. But we note, as the Second Circuit did, that "such considerations are the stuff of decisions about the scope of equitable relief, and rest in the sound discretion of the [trial] court." *NYLAG*, 987 F.3d at 225-26.

## V.     Conclusion

For the foregoing reasons, we affirm the order of the Superior Court requiring online publication and production to TPM of DCPS and OSSE budget-request documents for fiscal years 2019 through the present. We vacate and remand the portion of the order that requires publication of all other documents that are subject to D.C. Code § 2-536.

*So ordered.*